In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1571

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

GARY L. KNOX,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:05-cr-20029—**Michael P. McCuskey**, *Chief Judge*.

————————

ARGUED OCTOBER 9, 2009—DECIDED NOVEMBER 10, 2010

————————

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Gary Knox was the mastermind of an extensive real estate scheme using grossly inflated property appraisals and false loan applications. Using the fraudulent appraisals, Knox convinced buyers to purchase properties at exorbitant prices and then duped lending institutions into extending mortgages based on the trumped up values. As a result, Knox was charged with and pleaded guilty to multiple counts of

bank fraud, wire fraud, mail fraud, and money laundering. At sentencing, the district court applied several enhancements to Knox's offense level based on Knox's use of sophisticated means, having ten or more victims, receipt of more than $1 million from financial institutions, and role as organizer of a scheme involving five or more participants. On appeal, Knox challenges the district court's application of these sentencing enhancements. He also attempts to challenge the district court's loss calculation in a pro se supplemental brief. We find that the district court properly applied all of the enhancements and that Knox waived his argument as to the court's loss calculation by making and then withdrawing the very same objection at the sentencing hearing. Therefore, we affirm Knox's sentence.

## I.  BACKGROUND

From 1998 to 2005, Knox orchestrated a multifaceted real estate "flipping" scheme in central Illinois. The scheme was carried out in various ways but remained the same at its core. Knox would procure a property at a nominal price ($100 to $5,000) either by buying it himself or causing it to be purchased under someone else's name, usually without their knowledge or consent. He would then "flip" the property by selling it to an unwitting buyer at an exorbitant price supported by fraudulent property appraisals that grossly inflated the property's value. Knox defrauded every party involved in these real estate transactions: he would tell property owners that he intended to sell their properties at their asking price,

but would then turn around, jack up the price, and use the falsified appraisals to convince buyers to buy and lenders to extend mortgages on the substantially inflated property value. Knox would then pocket the difference between the seller's true asking price and the grossly exaggerated purchase price he had represented to the buyer, and pay kickbacks to his accomplices, which included Knox's codefendants Dennis Wiese, Jr., who conducted most of the appraisals, and Frank Kelly Ciota, who assisted Knox with finding unwitting buyers to defraud.

The most common type of fraudulent transaction in the scheme involved Knox and Ciota locating owners of distressed rental properties in Springfield and Decatur, Illinois, who were interested in selling their properties. Posing as an agent for a group of real estate investors, Knox would promise the sellers that he could sell their properties for a price much higher than their asking price. Knox would then go about finding prospective buyers—many of whom were of modest means and lacked real estate experience—and present them with an opportunity to increase their monthly income with little effort: at a discounted price, with no down payment required, the buyer could purchase a rental property in an economically depressed area that would generate a considerable monthly income from the rent payments. Knox also used other strategies to lure buyers into the scheme, such as offering a $5,000 cash incentive for each property purchased, assuring the buyers that he would buy back the property if the buyer was later

unsatisfied with the purchase, and promising to act as the property manager, including locating tenants, collecting rents, and making the loan payments directly to the lenders.[1]

Unbeknownst to the buyers, however, this was not such a great deal. Knox would never follow through on any of his property management or buy-back promises, and the appraisals that Knox used to convince the buyers that they were getting a steal (e.g., by telling them that the asking price was lower than the inflated property valuation) were phony. The appraisals were usually created by Wiese, a licensed real estate appraiser whom Knox recruited to join the scheme. Wiese's appraisals were based on allegedly comparable sales data provided by Knox, who also gave Wiese a target price which was substantially marked up over the property's actual value. Knox calculated the target price by using information from Knox's wife, Vicki, who was a licensed real estate agent and had access to real estate databases and sales data. Knox would obtain

---

[1] Other versions of the scheme were less complicated. In some cases, Knox and Ciota would outright sell an unsuspecting property owner's home out from under them. Such was the case with an elderly couple in Decatur, whose home Knox and Ciota sold to Ciota's relatives (who believed they were participating in a legitimate transaction) for $43,000 without the couple's knowledge. In other instances, Knox and Ciota would purchase other homes under the names of certain relatives without their knowledge or approval, as was the case when Knox and Ciota caused Ciota's relatives to purchase four other homes owned by Knox without the relatives' approval.

information about sales of properties in better condition or outside the market area and pass this information along to Wiese with a suggestion that he use it to appraise the property at the elevated target price.

The next step in the scheme involved helping the buyer secure a mortgage loan. Knox would assist with this process by filling out the loan applications for the buyers. In doing so, he caused several false statements to be made on the applications concerning the amount and source of the down payment, the buyer's financial liquidity, and the amount of rental payments obtained from the rental property to be purchased. Many of these loan applications were processed through State Street Mortgage Company, a mortgage brokerage owned and operated by Dennis Schneider. As the mortgage broker, Schneider sought loan approval for buyers through various lending institutions with whom he regularly worked by presenting the institutions with the loan applications and Wiese's appraisals. Lenders, in turn, relied on the false information in the applications and on the exaggerated appraisals and extended mortgage loans for the inflated purchase prices.

The final step in the scheme was the closing, during which a title company completes the real estate purchase and loan transaction. Knox often utilized Tri-County Title Services, Inc., a company owned by Michelle Miller, for closings. Initially, Miller followed standard operating procedure for real estate closings—after the lender issued a loan commitment and transferred the funds to the title company, the title company would hold the funds in escrow until the closing, compile the loan documents

and mortgage agreement, conduct the settlement meeting with the buyer and seller present, and then distribute the sale proceeds after closing. Over time, however, Miller began to deviate from the standard procedure. On several occasions, she did not require the buyers or sellers to be present and would instead allow Knox to remove the loan documents from the title office under the guise of taking them to his clients for their signature. After forging the signatures of the buyer or seller, Knox would then return the documents to the title company for closing. Miller also began to distribute the closing checks (which represented the proceeds from the property sale) prior to the actual closing. Knox would then take this check to a bank and divide it into multiple cashier's checks, one of which would be made out in the buyer's name and in the amount of the down payment.[2] After the closing, Knox retained the majority of the sale proceeds, paid the seller the asking price for the property (which was always substantially lower than the actual purchase price), and then paid his accomplices.

Knox's scheme began to fall apart just as the buyers' rental properties did. Knox and Ciota never followed through with their obligations to manage the properties, locate tenants, or collect rent payments. Some buyers

---

[2] On at least one occasion, Knox arranged for some of the financing to be closed in the names of an unsuspecting buyer and Knox's company, Central Illinois Management & Development, which also allowed him to have unimpeded access to the loan disbursements.

also discovered that their properties were vacant, in disrepair, or uninhabitable. Knox and Ciota also failed to make the loan payments to the lenders as promised, which resulted in several buyers defaulting on their loans and many lenders initiating foreclosure actions. In total, Knox devised and participated in more than 150 fraudulent real estate transactions, which resulted in the lending institutions financing more than $7 million of fraudulent mortgages.

In April 2006, Knox pleaded guilty to three counts of bank fraud, in violation of 18 U.S.C. § 1344; one count of wire fraud, in violation of 18 U.S.C. § 1343; six counts of mail fraud, in violation of 18 U.S.C. § 1341; and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a). One year after his guilty plea but before his sentencing, he filed motions to withdraw the guilty plea and to dismiss the indictment, both of which were promptly denied by the district court.

At Knox's sentencing, the government elicited testimony from Daniel Bergan, a Federal Deposit Insurance Corporation ("FDIC") agent who was primarily responsible for the FDIC's investigation into Knox's mortgage scheme. Bergan testified that Knox received approximately $4.3 million for his part in the scheme. As part of his testimony, Bergan provided the court with a spreadsheet showing the transactions comprising Knox's gross receipt total. The spreadsheet also indicated the address of the property, the actual purchase price as displayed on the HUD-1 form, the amount mortgaged, and the amount received by Knox. Bergan also testified that the scheme had resulted in a loss

of approximately $4.7 million to the financial institutions defrauded, and he presented another spreadsheet showing each of the transactions on which he relied for the loss calculation. In addition to the information listed on the gross receipts spreadsheet, the loss calculation spreadsheet also included the value of the property after it was foreclosed or demolished, and the loss amount to the individual financial institutions.

Over Knox's objections, the district court applied several sentencing enhancements, including enhancements for using sophisticated means, having ten or more victims, gaining $1 million or more in gross receipts from a financial institution, and assuming an organizer role in a scheme involving five or more participants. After the application of the enhancements and a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, the district court determined Knox's final offense level to be 34 and criminal history category to be III, which resulted in an advisory guidelines range of 188 to 235 months' imprisonment. The district court sentenced Knox to 235 months' imprisonment and 5 years' supervised release on each count to be served concurrently. On appeal, Knox challenges his sentence, arguing that the district court committed clear error in applying the sentencing enhancements.

## II. ANALYSIS

We review a district court's application of the sentencing guidelines de novo and its findings of fact for

clear error. *United States v. Samuels,* 521 F.3d 804, 815 (7th Cir. 2008). A district court's factfinding at sentencing is entitled to deference "unless we have a definite and firm conviction that a mistake has been made." *Id.* (citations and internal quotation marks omitted).

## A. Use of Sophisticated Means

Knox first argues that the district court erred in applying U.S.S.G. § 2B1.1(b)(9)(C), which calls for a two-level enhancement if the offense "involved sophisticated means." The guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1(b)(9)(C) cmt. n.8(B). We have found that the enhancement is proper when the conduct shows "a greater level of planning or concealment" than a typical fraud of its kind. *United States v. Wayland,* 549 F.3d 526, 528-29 (7th Cir. 2008). As the Eighth Circuit puts it, the two-level enhancement "is proper when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety [offense]." (alteration in original) *United States v. Jenkins,* 578 F.3d 745, 751 (8th Cir. 2009) (citation and internal quotation marks omitted).

Here, it is clear that Knox's scheme qualifies as sophisticated for purposes of § 2B1.1. He deceived real estate buyers into purchasing overpriced properties by making promises he would never keep, and he lied to the sellers by telling them that he sold the properties for a lower amount than was true. He then tricked mortgage

lenders into financing properties at prices far exceeding the real property value by falsifying the prospective buyers' loan applications with misinformation about the source of the down payment and providing the grossly inflated appraisals. The district court did not err by finding that such falsifications qualify as "sophisticated" under § 2B1.1. *See United States v. Wu*, 81 F.3d 72, 73-74 (7th Cir. 1996) (finding that defendant's falsification of business records and use of false names were "sophisticated" under § 2T1.1(b)(2), the tax analog to § 2B1.1(b)(9)(c)).

Knox's coordination of various moving parts of the scheme and his ability to fool so many lenders into extending mortgages they otherwise would not have extended also speaks to the scheme's sophistication. In this regard, the instant case is analogous to *United States v. Rettenberger*, 344 F.3d 702 (7th Cir. 2003), which involved two defendants (a married couple) who had committed insurance fraud by convincing multiple insurance companies and a neurologist that the husband suffered from a disability which precluded him from working and entitled him to disability benefits from the insurance companies and the Social Security Administration. We found that the district court's application of the sophisticated means enhancement was proper because "[f]ooling a skilled neurologist and 14 insurers requires intricate maneuvers," as demonstrated by the need for the defendants to "present a picture consistent with the injury [the husband] supposedly suffered" and for "careful execution and coordination over an extended period." *Id.* at 709. Similarly, Knox's scheme required precision and

coordination with the other participants in the scheme. He worked with Miller to remove the loan documents from the title company and to receive the loan proceeds early so that he could return a portion as the down payment.[3] Knox also had to be careful to never allow the sellers and buyers to meet or see the loan documents so that he could avoid them discovering the true asking and purchase price of the property. Moreover, Knox's scheme required him to convince 21 lending institutions to extend grossly inflated mortgages to Knox's buyers. We find that deceiving that many banks into financing over 150 fraudulent transactions to the tune of $7 million "requires intricate maneuvers" similar to the those used in *Rettenberger. Id.* at 709.

Knox argues that his scheme was not sufficiently complex to warrant an enhancement for sophisticated means because he was "simply flipping real estate" and never attempted to conceal his identity or use fake contact information. But Knox misinterprets Application Note 8(B), which merely gives examples of conduct that "ordinarily" warrants the enhancement, such as "hiding assets or transactions . . . through the use of fictitious

---

[3] Knox's method of financing the down payment was itself intricate—it involved him taking a portion of the sales proceeds before there technically were any proceeds, since the closing had not yet occurred; using the money to purchase a cashier's check made out in the buyer's name, thereby concealing the true identity of the check purchaser and the source of the down payment; and then presenting the check to the title company as the down payment.

entities, corporate shells, or offshore financial accounts."
In no way is the note an exhaustive list of conduct re-
quired for a finding that a scheme was sophisticated,
so the fact that Knox may not have used offshore
accounts or fictitious entities is not dispositive.[4]

### B. Number of Victims

Knox next argues that the district court's application of
a two-level enhancement based on the number of victims
was erroneous. Section 2B1.1(b)(2)(A)(I) of the sentencing
guidelines provides that a defendant's base offense level
should be increased by two levels if the offense involved
ten or more victims. A "victim" for purposes of this section
is "any person who sustained any part of the actual loss
determined under subsection (b)(1)," *id.* § 2B1.1(b)(2)(A)(I)
cmt. n.1, and "actual loss" refers to "the foreseeable
pecuniary harm that resulted from the offense," *id.*
§ 2B1.1(b)(2)(A)(I) cmt. n.3.

Knox argues that the district court erred in applying
this enhancement because there was no testimony as to
whether it was the buyer or lender in each transaction
who sustained the actual loss. But this argument fails on
its face, as Knox acknowledges that, at a minimum,

---

[4] Moreover, Knox's use of his company's name on the mortgage
documents to facilitate his access to the sale proceeds during at
least one closing, *see supra* n.2, does indicate that he used a
corporate shell to conceal his scheme, which would warrant the
enhancement even under Knox's analysis.

there was at least one victim in every transaction. *See* Appellant's Br. at 19 ("[E]ither the buyer lost the money or the lender did. Given the evidence presented, there is no indication of which person suffered the loss."). Knox states that at least 21 lending institutions made loans to 24 buyers. These numbers alone justify the enhancement because there is at least one victim in every transaction and there were well over ten transactions—and therefore, more than ten victims—irrespective of whether it was the buyer or the lender that suffered the loss in each transaction. So, even under Knox's calculations, the scheme involved evidence of more than the ten victims necessary for the enhancement to apply.

Knox's reliance on *United States v. Arnaout*, 431 F.3d 994 (7th Cir. 2005), is misplaced. There, the defendant used his position as a director of a charity to solicit donations, which he claimed would only go to support humanitarian efforts. *Id.* at 997. In actuality, however, a portion of the money was used to raise funds to support groups engaged in armed confrontations and violence overseas. *Id.* at 998. We found that the district court erred by applying the enhancement for having more than 50 victims because the record failed to show that the funds of all 50 donors were illegally diverted. *Id.* at 997. *Arnaout* is inapplicable, however, because we know that at least one person in each of Knox's transactions was the victim, whether it was the buyer who purchased a home worth substantially less than the appraised value or the lender who issued a mortgage on a home worth substantially less than the appraisal indicated. In *Arnaout*, it was unclear whether more than 50 donors were made victims by virtue of

money being fraudulently diverted to other non-humanitarian efforts. *Id.* at 999. Here, it is abundantly clear that at least one person in every transaction was a victim and that the number of transactions exceeds ten, so the enhancement was proper.

## C.  Amount of Gross Receipts

When a defendant "derive[s] more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense," his base offense level is increased by two levels under U.S.S.G. § 2B1.1(b)(14)(A).[5] " 'Gross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." U.S.S.G. § 2B1.1(b)(14)(A) cmt. n.11(B). The term "financial institution" refers not only to banks, credit unions, and pension funds, but also to "any similar entity whether or not insured by the federal government." *Id.* § 2B1.1(b)(2)(A)(I) cmt. n1.

Knox contends that the spreadsheets FDIC agent Bergan used to explain his gross receipt calculation were "conclusory" and insufficient to support the application of this enhancement because none of the HUD-1 forms or the checks on which the spreadsheets were based were presented as evidence. However, unlike at trial, a district judge is not constrained by the rules of evidence at

---

[5]  At the time Knox was sentenced, this was § 2B1.1(b)(13)(A); however, the subsequent change in numbering is not material.

sentencing hearings. *United States v. Schroeder*, 536 F.3d 746, 752 (7th Cir. 2008). "In determining whether the government has met its burden of proof at sentencing, a court may consider information that would not have been admissible at trial if it has sufficient indicia of reliability to support its probable accuracy." *Id.* at 753 (citation and internal quotation marks omitted).

Bergan testified that he obtained the information reflecting the amount of money Knox received from cashiers' checks, bank accounts, HUD-1 forms, and other documents collected during his investigation. Knox did not challenge this testimony or the admission of the spreadsheets as exhibits during sentencing[6], and the district court correctly accepted as sufficiently reliable Bergan's explanation as to how he obtained the figures. *See United States v. Statham*, 581 F.3d 548, 553 (7th Cir. 2009) (finding that district court's reliance on testimony of two cooperating witnesses, some of which was con-

---

[6] In fact, Knox raised an entirely different challenge during the sentencing hearing than his argument on appeal. During sentencing, Knox argued that many of the lenders were not financial institutions. Never before has Knox challenged the reliability of Bergan's calculations. Nonetheless, because it is not clear that Knox's failure to do so was strategic, we treat this as a forfeiture rather than a waiver and reject Knox's argument on the merits. *See United States v. Jaimes-Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005) (explaining that defendant forfeits an argument not raised as a result of an accidental or negligent omission but waives an argument that he selects not to assert as a matter of strategy).

tradictory, was "no reason to upset the credibility deter-
minations of the district court" and that "the informa-
tion on which it depended was reliable"). We find no
error in the district court's finding that it was more likely
than not that Knox's gross receipts totaled more than
$1 million.

### D. Organizer in Scheme Involving Five or More Participants

Knox's next argument concerns the district court's
application of U.S.S.G. § 3B1.1(a), which directs the sen-
tencing judge to increase a defendant's base offense level
by four levels "if the defendant was an organizer or leader
of a criminal activity that involved five or more partici-
pants or was otherwise extensive." Factors to be considered
when determining whether the adjustment is warranted
include the exercise of decision-making authority, the
nature of participation in the commission of the offense,
the recruitment of accomplices, the claimed right to a
larger share of the fruits of the crime, the degree of partici-
pation in planning or organizing the offense, the nature
and scope of the illegal activity, and the degree of control
and authority exercised over others. *Id.* § 3B1.1(a) cmt. n.4.

Knox contends that the four-level adjustment was
improper because the scheme only involved four partici-
pants since only four people were found criminally respon-
sible: Knox, Ciota, Wiese, and Schneider. This, however,
misreads the guidelines provision, which defines a
"participant" as "a person who is criminally responsible
for the commission of the offense, but *need not have been*

*convicted*." *Id.* § 3B1.1(a) cmt. n.1 (emphasis added). As such, a person need not be convicted of a crime to be criminally responsible, and the district court properly looked beyond the three individuals who were convicted (Knox, Ciota, and Wiese, all of whom pleaded guilty) and a fourth individual who was facing charges for his role in the scheme (Schneider) to determine the number of participants. Those four were obvious participants, and the district court accepted the government's argument that the fifth participant in the scheme was Miller, who although never criminally charged, admitted that she knowingly participated in the scheme by advancing funds on loans that had not closed at the direction of Schneider, who introduced Miller to Knox. Even absent a finding that Miller was "criminally responsible" for purposes of § 3B1.1(a), her involvement would still indicate that the scheme was "otherwise extensive" since Knox made use of her services.[7] Accordingly, the district court did not err by determining that the scheme involved five or more participants.

---

[7] This finding is bolstered by Knox's use of other individuals who were never charged with a crime, including Vicki Knox, whose real estate resources were utilized to find "comparable" sales data for Knox's inflated target price, and Cathy Marshall, a loan processor at Schneider's mortgage company who repeatedly notarized paperwork for Knox despite knowing that Knox was affixing the signatures of buyers and sellers. Knox does not dispute Miller's and Marshall's roles in the scheme and has not given us any reason as to why Miller's and Marshall's participation does not comprise a part of Knox's otherwise extensive scheme.

We also reject Knox's assertion that he did not have a leadership role because each participant played an individual role and he did not exert control over any of them. We have previously acknowledged that being "an organizer or leader does not necessarily mean that [the defendant] directly controlled other individuals. Rather, the defendant must have exercised some degree of control over others involved in the commission of the offense *or* he must have been responsible for organizing others for the purpose of carrying out the crime." *United States v. Wasz,* 450 F.3d 720, 729 (7th Cir. 2006). As the district court found, Knox was an organizer because he was "the straw that stirs the drink here," as shown by his role as the "mastermind of the scheme," his recruitment of Wiese and Ciota, his receipt of the "lion's share" of the scheme's proceeds, and his exercise of decision-making authority and control over others (e.g., his suggestions that Wiese appraise the properties in line with Knox's target price). The district court's calculation of the number of participants in the scheme and its determination that Knox was an organizer were both proper.

### E. Waiver of Challenge to Loss Calculation

Because the loss amount was greater than $2.5 million, Knox's base offense level was increased by 18 levels pursuant to U.S.S.G. § 2B1.1(b)(1). Knox initially filed an objection to this calculation in the presentence report, but withdrew the objection at the sentencing hearing. Before accepting the withdrawal, the court addressed defense counsel and Knox personally to confirm that he intended

to withdraw this argument. The court queried defense counsel, "Now you're withdrawing the 18-level objection because you believe [counsel] that the evidence shows more than $2.5 million?" Knox's attorney replied, "That's correct, Your Honor." The district court then asked Knox directly, "Mr. Knox, do you agree with that?," to which Knox replied, "Yes, Your Honor." The district court followed up, asking, "Anybody force you to say that? . . . Threatened you in any way? . . . Promised you anything to get you to say that?" Knox replied, "No, sir." to each question. The district court then stated on the record that the objection was withdrawn. Despite this colloquy, Knox has now filed a pro se supplemental brief in which he challenges the district court's determination that the amount of the loss exceeded $2.5 million.

Knox's statements on the record evince a knowing waiver as to the loss calculation issue. As the Supreme Court has explained, the difference between waiver and forfeiture is that "forfeiture is the failure to make the timely assertion of a right, [whereas] waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano,* 507 U.S. 725, 733 (1993) (citation omitted). And we have held that "a defendant waive[s] his right to challenge a sentencing calculation by initially objecting to the calculation, but later withdrawing the objection." *United States v. Kincaid,* 571 F.3d 648, 654 (7th Cir. 2009) (citations omitted). Such is the case here, where Knox initially raised an objection to the loss calculation and then later withdrew it, as indicated in both his and defense counsel's statements on the record.

Knox's waiver precludes our review of his challenge to the loss calculation because "if there has been a valid waiver, there is no 'error' for us to correct." *United States v. Lakich,* 23 F.3d 1203, 1207 (7th Cir. 1994); *see United States v. Harris,* 230 F.3d 1054, 1058-59 (7th Cir. 2000) ("[W]e cannot review waived issues at all because a valid waiver leaves no error for us to correct on appeal.").

### III. CONCLUSION

Knox's enhancements were proper, and the judgment of the district court is AFFIRMED.