**<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>**

File Name: 14a0164n.06

Case No. 13-1300

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Feb 27, 2014 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| RYAN ZUNDEL, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |

BEFORE: DAUGHTREY, SUTTON, and DONALD, Circuit Judges.

**Bernice B. Donald, Circuit Judge**. Pursuant to a Rule 11 Plea Agreement, Appellant Ryan Zundel pleaded guilty to two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. The district court sentenced Zundel to two consecutive sixty-month prison terms, imposed a mandatory $200 special assessment, and ordered him to pay $34,548,879 in restitution. Zundel now appeals, arguing that the district court improperly imposed a two-level Sentencing Guidelines enhancement for a crime with more than ten victims and that the district court's restitution order was issued in error. We **AFFIRM** Zundel's sentence but **REMAND** on the issue of restitution.

I.

From 2003 to 2007, Zundel participated in a scheme to defraud Detroit-area mortgage lenders out of millions of dollars. Zundel owned Bretlin Home Mortgage, where he directed loan processors who both submitted fraudulent loan applications and prepared fraudulent loans for closing. This scheme involved two types of false loans—"real" loans and "ghost" (or "G") loans. Typically, the same residential property would be used simultaneously as the collateral for one "real" loan and as the purported collateral for several "G" loans funded by different lenders. Though these "real" loans involved actual title companies and had properly recorded deeds and mortgages, the applications and other documents for them were false. The borrowers in the "real" loan applications were straw buyers who were recruited, often by Zundel, and paid handsomely. Down payments in these "real" loan transactions were made using proceeds from the scheme, rather than the supposed borrower's personal funds. For "G" loans, only the mortgage lenders were real; everything else was fabricated by participants in the scheme. Lenders in these "G" loan transactions were left unsecured and without collateral.

On June 16, 2010, the government initially charged Zundel, along with six others, with a single count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, an offense carrying a 360-month maximum sentence. After plea bargaining, the government filed a superseding information on August 2, 2011, charging Zundel with two counts of conspiracy under 18 U.S.C. § 371; since each of these counts carried a 60-month maximum sentence, Zundel's maximum potential incarceration time dropped from thirty years for the single count under 18 U.S.C. § 1349 to ten years for the two counts under 18 U.S.C. § 371.

On February 7, 2012, Zundel pleaded guilty pursuant to a Rule 11 plea agreement. Under this agreement, Zundel pleaded guilty to Count One (pertaining to the "real" loans) and Count

Two (pertaining to the "G" loans) of the superseding information, both of which alleged conspiracy to commit wire fraud in violation of § 371. The agreement acknowledged that the parties disagreed about the applicable Sentencing Guidelines' range. The government argued that Zundel's range should be 121 to 151 months (capped by the 120-month statutory maximum) based on an adjusted offense level of 32—enhanced from the base offense level of 6 due to a loss amount of $34,548,879 (twenty-two levels under U.S.S.G. § 2B1.1(b)(1)(L)), there being more than ten victims (two levels under § 2B1.1(b)(2)(A)), and the use of sophisticated means to perpetuate the crime (two levels under § 2B1.1(b)(9)(c)), coupled with a three-level upward adjustment for Zundel's playing a managerial or supervisory role under § 3B1.1(b) and a three-level downward adjustment for acceptance of responsibility under § 3E1.1. Zundel, on the other hand, placed the loss amount at $16,755,960, contended that his conduct did not involve ten or more victims, and disputed that he was a manager or supervisor; he calculated his total offense level as 25 and his recommended range as 57-71 months. The agreement stipulated that the district court would make the factual findings necessary to resolve these disputes by a preponderance of the evidence.

The plea agreement contained two other provisions pertinent to this appeal. First, regarding restitution, the agreement provided: "The court shall order restitution to every identifiable victim of defendant's offenses and all other relevant conduct. The victims and their respective loss amounts will be identified at sentencing." Second, the agreement contained a waiver of right to appeal, which stated in relevant part that if the district court imposed a prison term between 72 and 151 months, then Zundel could only appeal adverse rulings on Sentencing Guidelines disputes regarding the amount of loss, the number of victims, or his role as a manager or supervisor.

On April 10, 2012, the United States Probation Office prepared a Presentence Report ("PSR") for Zundel. The PSR, which tracked the government's calculation in Zundel's plea agreement, placed Zundel's total offense level at 32 and calculated the loss at $32,548,879 for the purposes of restitution. The government filed its sentencing memorandum on January 3, 2013, and Zundel filed his on January 8, 2013. Zundel's memorandum challenged, among other things, the number of victims, stating:

> The parties agreed to disagree on the number of victims. While given the number of financial institutions listed in the PSR as victims, it may be questionable whether the number of victims attributable to Defendant's conduct will be under ten, the number will be unknown until Defendant has had the opportunity to review the loan documents regarding the questioned loans in the spreadsheet.

After postponing sentencing at Zundel's request four different times over the course of five months, the district court finally held the sentencing hearing on February 12, 2013. During this hearing, Zundel argued that his offense only involved nine, rather than ten or more, victims. Zundel also challenged the government's loss calculation. After hearing argument from both parties, the district court overruled Zundel's objections to the enhancements under U.S.S.G. §§ 2B1.1(b)(1)(D) (pertaining to the amount of loss) and 2B1.1(b)(2)(A)(i) (pertaining to the number of victims). The court determined that his Guidelines range was 135 to 168 months, though capped at 120 months by statute, and sentenced Zundel to 120-months incarceration. Although Zundel asked that the district court reserve the issue of restitution, the district court further ordered Zundel to pay restitution in the amount of $34,548,879.

On February 15, 2013, Zundel filed a motion for a restitution hearing. On March 6, 2013, while that motion was still pending, the district court entered judgment reflecting its rulings at the sentencing hearing; Zundel filed a notice of appeal the same day. After holding a hearing on Zundel's motion, on May 15, 2013 the district court entered an order stating that

Zundel's appeal vested jurisdiction in the appellate court and therefore deprived the district court of jurisdiction to resolve Zundel's motion for a restitution hearing. The order noted, however, that if this Court were to remand the case, then the district court would grant Zundel's motion in part by permitting briefs regarding restitution and then, if appropriate, scheduling a restitution hearing. Fed. R. Crim. P. 37 and Fed. R. App. P. 12.1 required that Zundel promptly notify this Court of the district court's May 15, 2013 order. The record indicates that Zundel did not notify the Court until he filed his brief on October 11, 2013.

II.

We review the district court's interpretation of the Sentencing Guidelines de novo and its sentencing determination for abuse of discretion. *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009); *see also Gall v. United States*, 552 U.S. 38, 51 (2007). We accept the district court's findings of fact unless they are clearly erroneous and give deference to the district court's application of the Guidelines to the facts. *United States v. Galaviz*, 645 F.3d 347, 358 (6th Cir. 2011).

A.

Zundel first challenges the district court's application of a two-level enhancement under U.S.S.G. § 2B1.1(B)(2)(A)(i) for a crime involving ten or more victims. Zundel contends that he raised a factual objection to the number of victims listed in the PSR, which shifted the burden to the government to prove the facts necessary for the ten-or-more-victims enhancement by a preponderance of the evidence, and that the government did not present sufficient evidence to justify the enhancement. Zundel misapprehends his and the government's duties.

"When a defendant fails to produce any evidence to contradict the facts set forth in the PSR, a district court is entitled to rely on those facts when sentencing the defendant." *United*

*States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2007). Further, as we stated in *United States v.*

*Lang*, 333 F.3d 678 (6th Cir. 2003):

> A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a bare denial, he must produce some evidence that calls the reliability or correctness of the alleged facts into question. If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. But the defendant gets no free ride: he must produce more than a bare denial, or the judge may rely entirely on the PSR.

*Id*. at 681 (quotation omitted). Although Zundel's sentencing memorandum noted that he

disputed the number of victims, Zundel never filed objections to the PSR and did not produce

evidence to support his opposition to the PSR's calculation of the number of victims before his

sentencing hearing.

During his sentencing hearing, Zundel orally objected to the PSR's number of victims.

Zundel's counsel explained that although he had not intended to pursue this objection, he had

changed his mind the night before the hearing because, after speaking with Zundel, he concluded

that "there's a possibility that there is less than ten [victims]." Zundel contended that he had

reviewed the list of victims in the PSR but that he could only remember dealing with nine

primary mortgage lenders and that he therefore reserved the right to object to a finding of ten or

more victims. Further, Zundel argued that these primary lenders may have sold the mortgages to

other holders, who, in turn, could have again resold the mortgages. Zundel argues that because

mortgages are generally resold without recourse, only the parties who suffered financial loss

should qualify as victims. Zundel contended then, as he does now, that the PSR's victim list

over-represents the number of victims by impermissibly counting multiple holders of the same

loan as multiple victims.

Zundel offered neither evidence of the mortgages having been resold and bundled nor

evidence of multiple holders of the same loan being counted as multiple victims. On questioning

from the district court, Zundel admitted that the only evidence to support his contention was his own oral identification of the nine lenders with whom he had dealt and that he had not advised the government of which victims he believed did not belong on the victim list. Zundel later admitted that he lacked any specific facts to address the list of alleged victims. As the district court stated, Zundel's bare allegations left it with two options: "taking [Zundel's] comments and viewing them as being speculative or treating the Government's assertions as being uncontested." Because Zundel did not produce evidence to call the reliability of the PSR's victim list into question, the burden of persuasion never shifted to the government. *See Lang*, 333 F.3d at 681. Accordingly, the district court did not err in overruling Zundel's objection and relying on the PSR's findings regarding the number of victims.

Even if Zundel had satisfied *Lang*'s requirement to introduce evidence supporting his challenge to the PSR and shifted the burden to the government, a review of the record indicates that Zundel's argument that there may be fewer than ten victims is unfounded. As the government explained during the sentencing hearing, it only counted one victim per transaction. Likewise, Zundel stated "my suspicion is that for each individual loan, ultimately, there's going to be one victim." Under this one-loan-one-victim theory, Zundel's involvement with far more than ten "G" loans—each of which left a lender unsecured and without collateral—provides enough victims to justify applying U.S.S.G. § 2B1.1(B)(2)(A)(i).

The Seventh Circuit employed similar reasoning in *United States v. Knox*, 624 F.3d 865, 872 (7th Cir. 2010). The *Knox* defendant used a fraudulent real estate flipping scheme wherein he duped buyers into purchasing properties at inflated prices and then tricked lenders into extending mortgages based on these exaggerated values. *Id*. at 867. Knox argued that because it was uncertain whether the buyer or the lender in each transaction sustained the actual loss, the

number of victims could not be determined. *Id*. at 873. The Seventh Circuit, however, held that because Knox had acknowledged that there would be at least one victim for every transaction, the court could apply U.S.S.G. § 2B1.1(B)(2)(A)(i) without having to identify exactly who bore the loss for each transaction. *Id.* at 872. The rationale from *Knox* imports nicely here; in each fraudulent loan transaction, of which there were more than ten, someone—be it the originating lender or a successor—suffered an actual loss and thus qualifies as a victim for the purposes of U.S.S.G. § 2B1.1(B)(2)(A)(i). The district court, therefore, did not err in applying the ten-or-more-victims enhancement.

B.

Zundel also relies on evidence presented at the sentencing of his co-conspirator, Ronnie Duke, to argue that the ten-or-more-victims enhancement should not apply. Pursuant to a Rule 11 plea agreement, Duke pleaded guilty on July 5, 2012 to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Although § 1349 carries a thirty-year maximum sentence, based on Duke's substantial assistance, his plea agreement capped his maximum sentence at fifteen years. As here, the parties disagreed about Duke's applicable Guidelines range, particularly the number of victims (over fifty) and the loss amount ($100 million). In the plea agreement, the government placed Duke's range at 360 months to life, whereas Duke calculated his range at 262 to 327 months. After a later-filed PSR factored in Duke's entire criminal history, his range—even without the disputed enhancements for more than fifty victims and a $100 million in losses—shifted to 324 to 405 months.

Duke was the last of the co-conspirators to be sentenced; his sentencing hearing took place roughly two months after Zundel's on April 8, 2013. At sentencing, Duke objected to the government's calculations of loss amount and the number of victims. He bolstered his

objections with an opinion witness, Chip Cummings, who concluded that Duke's loss amount

was $94 million and that Duke's crimes only affected forty victims. So that there would not be

any Guidelines disputes, the government agreed to accept these findings. The government now

explains that it did not endorse Cummings's calculations but decided not to contest them because

the bottom of Duke's range exceeded the 180-month cap and therefore any additional Guidelines

determinations would be wholly academic. Over the government's objection that the issues were

undisputed, the district court allowed Cummings to testify regarding his quantification of victims

and loss.

Zundel latches onto Cummings's analysis indicating that there were fewer than fifty

victims in Duke's case to support his argument that there were fewer than ten victims in his own

case. Because Duke was the mastermind of the entire mortgage fraud scheme, Zundel contends

that the victim list attached to Duke's restitution order comprises an exhaustive list of victims for

the entire scheme. Zundel claims that comparing the government's loss spreadsheet in his case

with the restitution order in Duke's judgment proves that, in his case, only nine entities suffered

losses and thus that there were only nine victims. Our review indicates that Zundel must have

miscounted. In its loss chart for Zundel's case, the government identified twenty-two lenders[1]

whose loans resulted in a loss. Of these twenty-two lenders, ten[2] appear as victims in Duke's

restitution order. The overlap of these ten institutions reaffirms that Zundel's crime involved ten

---

[1] These twenty-two lenders in the government's chart are Aames Funding Corp., Aegis Wholesale Corp., Argent Mortgage, Bayrock, BNC Mortgage, Chase Bank, Credit Suisse Financial, Decision One Mortgage, Entrust Mortgage, FMF Capital, Fremont Investment, Impac Funding Corp., Lime/Green Light Financial Services, Long Beach Mortgage, MILA, Inc., Novastar Mortgage, People's Choice, PHM Financial Inc., Rocky Mountain Wholesale, Saxon Mortgage, Southstar Funding, and Wilmington Finance.

[2] The ten overlapping lenders are Aegis Wholesale, Argent Mortgage, Chase Bank (listed as "JP Morgan Chase"), Credit Suisse Financial, Fremont Investment, Novastar Mortgage, People's Choice, PHM Financial, Saxon Mortgage (listed as "Morgan Stanley-Saxon Mortgage Services"), and Wilmington Finance.

or more victims and that the district court properly applied a two-level enhancement under U.S.S.G. § 2B1.1(B)(2)(A)(i).

## III.

Zundel also contends that the district court erred in issuing its restitution order because it did not specifically identify the victims who suffered losses and the amount owed to each victim. After his sentencing, Zundel filed a motion for a restitution hearing on February 15, 2013. Without ruling on Zundel's motion, the district court entered judgment on March 6, 2013. Zundel filed a notice of appeal the same day, thereby divesting the district court of its jurisdiction to hear his motion for a restitution hearing. On May 15, 2013, the district court entered an order stating that it lacked jurisdiction to entertain Zundel's motion for a restitution hearing. Consistent with Fed. R. Crim P. 37(a), the order noted that if this Court were to remand the case, then the district court would grant Zundel's motion in part by permitting briefing on the issue of restitution and then scheduling a restitution hearing if the court deemed it appropriate. We now remand the question of restitution to the district court.

We end with two observations. First, Zundel completely neglected both Fed. R. Crim. P. 37(b) and Fed. R. App. P. 12.1(a)'s requirements to "promptly notify" the clerk of this Court about the district court's order of May 15, 2013. His failure to comply with these notice requirements could permit us to conclude that Zundel had forfeited his restitution argument, were we so inclined. Second, we note that the appeal-waiver provision of Zundel's plea agreement forecloses his ability to appeal the district court's eventual ruling on his motion for a restitution hearing.

IV.

For the foregoing reasons, we **AFFIRM** the district court's imposition of a 120-month sentence and **REMAND** the issue of restitution to the district court.