In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-3631 & 12-3670

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANIEL SULLIVAN and
JOHN J. SULLIVAN,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CR 821 — **Rubén Castillo**, *Chief Judge.*

ARGUED FEBRUARY 19, 2014 — DECIDED AUGUST 28, 2014

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendants-appellants, Daniel Sullivan and John J. Sullivan, are brothers who owned a group of companies that offered remodeling services to homeowners: New Look Home Services, J&D Home Services, A-Z Home Services, and Contract Services. While the appellants provided honest work on construction jobs when their clients paid in cash, they fabricated a far more profitable, but illegal scheme.

By promising homeowners that they could remodel their homes at a discount, the appellants duped numerous people into refinancing their homes and paying the loan proceeds directly to one of the appellants' companies. Once they had the money, the appellants left the job sites unfinished and the homeowners' finances in disrepair.

The appellants targeted neighborhoods on the South and West sides of Chicago. Some of the appellants' employees worked as telemarketers and cold-called homeowners. Daniel Sullivan told telemarketer Martin Kelliher to look for "elderly, ignorant homeowners," and John Sullivan added that "[t]he more ignorant, the better. Also, the older, the better." Reading from a script provided by the appellants, employees asked unsuspecting homeowners if they needed remodeling work; if they said yes, the employees offered free in-person estimates. The appellants also hired employees to distribute flyers advertising their discounted remodeling services door-to-door and used a company to mass mail flyers to residents of these target neighborhoods.

Once these advertising efforts stimulated leads, the appellants either visited the homeowners themselves or sent their salesmen, James Browning and Pat Rooney. John Sullivan told Browning to have customers sign blank contracts "in case we ever need to amend something to suit us better" or the blank contracts "could be used as a release." John Sullivan maintained the predatory sales mantra, telling Browning that the small cash remodeling jobs "keep[] the track open, but the refinancing, we get rich with those."

The appellants referred the homeowners to specific loan officers, usually Jeff Kleinberg and Angelo Petropoulos, who completed the refinancing. The appellants required the homeowners to sign letters of direction, so the title companies sent checks directly to the appellants' companies. With the checks from the refinance in hand, the appellants then required the homeowners to sign over the checks because they needed payment before the remodeling work could begin. The appellants hired subcontractors to do some of the work, but then abandoned the remodeling jobs before completion. From 2002 to 2006, the appellants collected over $1.2 million from over forty homeowners who were victims of the scheme.

In January 2011, a grand jury returned an indictment charging Daniel and John Sullivan with wire fraud in violation of 18 U.S.C. § 1343. They were prosecuted in the same trial. The government presented testimony from six victimized home-owners; testimony from J&D Home Services employees; testimony from a subcontractor who worked on J&D Home Services projects; documents from the appellants' business and personal records; and testimony from various bankers and investigators who verified the financial transactions. The jury found Daniel and John Sullivan guilty of two counts of wire fraud each.

At the sentencing hearing, the district court found that the loss calculation for the appellants' scheme was more than $400,000 but less than $1,000,000 and accordingly increased the appellants' offense level. The district court also applied five separate offense level enhancements because the appellants' conduct involved: (1) vulnerable victims; (2) a violation of a prior court order; (3) sophisticated means; (4) mass-marketing

or ten to forty-nine victims; and (5) leadership or organization of the scheme. The district court sentenced each Sullivan brother to 168 months' imprisonment.

The appellants do not appeal their convictions but they challenge the length of their sentences. They argue that the district court's factual findings in the loss calculation and the application of the five other offense level enhancements were in error.

The government has the burden of proving a defendant's relevant conduct by a preponderance of the evidence at sentencing. *United States v. Schroeder*, 536 F.3d 746, 753 (7th Cir. 2008). We review the district court's factual findings during sentencing for clear error, and "we will only reverse if we are left with the definite and firm conviction that a mistake has been made." *United States v. Love*, 680 F.3d 994, 999 (7th Cir. 2012) (quoting *United States v. Radziszewski*, 474 F.3d 480, 486 (7th Cir. 2007)). We address each of the appellants' arguments in turn.

### A.  The Loss Calculation

At sentencing, the court calculates the actual or intended loss amount associated with a defendant's fraud and applies whichever is greater. U.S.S.G. § 2B1.1 cmt. app. n.3(A). The court's loss calculation amount only needs to be "a reasonable estimate of the loss." *Id*. § 2B1.1 cmt. app. n.3(C). To succeed on appeal, a defendant must show that the court's loss calculation "'was not only inaccurate but outside the realm of permissible computations.'" *United States v. Hassan*, 211 F.3d 380, 383 (7th Cir. 2000) (quoting *United States v. Jackson*, 25 F.3d 327, 330 (6th Cir. 1994)).

The appellants contend that each remodeling job varied in terms of scope and amount of work completed. Therefore, they argue that the district court overestimated the loss amount by accepting the government's contention that every refinance job was fraudulent without making a definite finding of each victims' actual losses.

For its proffer on forfeiture, the government totaled the gross income from the appellants' refinance jobs from 2002 to 2006, then deducted the labor and material costs. The government based the labor costs on the trial testimony of Kryzsztof Koterba, the appellants' primary subcontractor, who said the most the appellants ever paid him on a project was $8,000; the government based the material costs on an account the appellants had at a store called Remodelers Supply. The government concluded that the appellants caused a loss of $756,924.90.

To debunk the government's calculation, appellants' counsel argued that the evidence at trial did not support the notion that "every refi is a bad refi." Counsel addressed the work performed at one victim's house, arguing that "[i]f you look at the pictures … there's a lot of concrete laid and a walkway … There was a new boiler put in. These things cost a lot of money." Counsel disputed labor costs by stating that subcontractors other than Koterba worked for the appellants. Counsel also attacked the accuracy of the government's deduction for material costs, noting that "sometimes [the appellants] went to Home Depot. They didn't always buy materials at Remodelers [Supply]." Counsel closed with a general argument that "[a]ny time you do a remodeling job … I think if you hire a contractor, you can reasonably expect them

to double the price of materials and double the price of their labor …" and concluded that the appropriate forfeiture amount should be between $80,000 and $100,000.

The district court, for the most part, accepted the government's calculation. The district court reasoned that actual, not intended loss was appropriate "since subcontractors were used, [and] that amount of services needs to be deducted from the loss." However, the district court increased the deduction for material costs by ten percent, "to allow for those costs that were incurred at other places, such as Home Depot." Given that the maximum estimated labor and material costs per job was about $15,000, the district court excluded all refinance jobs less than $15,000 before calculating actual loss. The district court found a forfeiture and loss amount of $748,601.90, which increased the appellants' offense levels by fourteen points.

We find that the district court reasonably estimated the loss attributed to the appellants' scheme. While subcontractor Koterba testified that the most he ever received was $8,000, the district court used the more conservative $15,000 to determine the universe of transactions that should be considered fraudulent. This step was done before calculating actual loss to ensure that only fraudulent proceeds were thrown into the pot all. This made the overall calculation even more conservative and thus especially reasonable.

The appellants submitted no evidence of their net proceeds from the refinance projects, no invoices from Koterba or other subcontractors, nor any receipts for the materials they purchased from other locations. The appellants' counter-arguments were "wholly unsubstantiated statements" that do

not "'undermine, nor even question, the court's acceptance of the government's proof of loss.'" *Borassi*, 639 F.3d at 784 (quoting *United States v. Sensmeier*, 361 F.3d 982, 989 (7th Cir. 2004)). There was no error in the district court's decision to base its loss calculation on the reasonably reliable evidence submitted by the government "rather than a sum ascertained by conjecture." *Radziszewski*, 474 F.3d at 487.

### B. Vulnerable Victim Enhancement

The application of the vulnerable victim enhancement is appropriate when "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" is a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. app. n.(2). A victim's financial desperation is an example of how a person can be susceptible to a financial crime. *United States v. Johns*, 686 F.3d 438, 460 (7th Cir. 2012). A victim may be vulnerable based on any applicable factor and only one victim needs to be vulnerable, not the entire targeted group. *United States v. White*, 737 F.3d 1121, 1142 (7th Cir. 2013).

The appellants attack this enhancement two-fold. They argue that none of their victims qualify as vulnerable; and if they do, the government failed to prove that the appellants knew or acted upon their victims' vulnerability.

We find that there was sufficient testimony from the six victims at trial to support the district court's finding that the victims qualified as vulnerable. Harold Ray, for instance, was a fifty-nine year old retiree dependent upon Social Security

disability payments after suffering a stroke. There was also sufficient evidence to support the court's finding that the appellants knew of their victims' vulnerabilities. Kelliher's testimony was direct evidence that the appellants targeted elderly and unsophisticated people for their refinancing scheme. Additionally, the appellants did not take advantage of all their customers, only the ones willing to refinance their homes. *See United States v. Christiansen*, 594 F.3d 571, 576 (7th Cir. 2010) (offering services selectively instead of to the general public at-large was evidence that a defendant knew her victims were susceptible to fraud). The appellants selectively targeted their victims, and the district court did not err in its application of this enhancement.

### C. Violation of a Prior Judicial Injunction Enhancement

The parties stipulated that "[o]n May 13, 2004, the Circuit Court of Cook County, Illinois, entered a permanent injunction against John Sullivan and New Look Home Services, Incorporated, barring John Sullivan and New Look Home Services from engaging in the home repair business in the city of Chicago." The U.S. Sentencing Guidelines provide for a two-level increase in the offense level if a defendant's conduct violated "any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere" in the Sentencing Guidelines. U.S.S.G. § 2B1.1(b)(9)(C).

The appellants first challenge this enhancement on the ground that John took affirmative steps to avoid violating the injunction. Secondly, they argue that the injunction did not prevent Daniel or anyone other than John Sullivan

from engaging in activity otherwise prohibited by the 2004 injunction.

Browning's testimony undermines the appellants' argument that John Sullivan took steps to avoid violating the prior injunction. Browning testified that after Cook County issued the injunction, the appellants told him that the only way to keep New Look Home Services operational was to start a new company and name him as president. The appellants told Browning that John Sullivan could not be president any longer because of the injunction. Daniel Sullivan also told Browning that he could not be president because he needed to hide the company's assets from his ex-wife. Browning agreed to the arrangement, Daniel Sullivan paid Browning $500, and the appellants had a lawyer make the changes. From then on Browning was the named president of J&D Home Services, but his actual role did not change. John Sullivan may have ceased participating in outside sales, but did not stop managing J&D Home Services, paying the employees' paychecks, or engaging in the home repair business. There was no error in the district court's application of this enhancement against John Sullivan.

Moreover, a defendant does not need to be named in the prior order for the enhancement to apply; it is sufficient that the defendant controlled the named entity and had knowledge of the prior order. U.S.S.G. § 2B1.1 cmt. app. n.(8)(C). Daniel Sullivan was a co-owner of New Look Home Services and worked in partnership with his brother before the injunction. Daniel Sullivan obviously knew about the prior injunction—he told Browning about it and he paid Browning $500 for the use of his name. There was no error in the district court's applica-

tion of this sentencing enhancement against Daniel Sullivan either.

### D. Sophisticated Means Enhancement

The appellants argue that their crime was the "garden variety home repair fraud scheme" and the district court's application of the sophisticated means enhancement was in error. We are not convinced.

The Sentencing Guidelines' commentary defines "sophisticated means" as an "especially complex" operation "pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. app. n.(9)(B). In a real estate fraud case, we held that a defendant's "coordination of various moving parts of the scheme and his ability to fool so many" victims spoke "to the scheme's sophistication." *United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010). Knox, a real estate broker, "deceived real estate buyers into purchasing overpriced properties by making promises he would never keep, and he lied to sellers by telling them that he sold the properties for a lower amount than was true. He then tricked mortgage lenders by falsifying the prospective buyer's loan applications." *Id*.

The appellants' scheme is analogous to *Knox*. The appellants falsified construction contracts and lied to convince homeowners into paying substantial sums from their refinance loans for remodeling work the appellants never intended to finish. The appellants coordinated various moving parts—their employees, subcontractors, and mortgage brokers—to fool their victims. The district court did not err in its finding that the appellants used sophisticated means to achieve their scheme.

### E.  Mass-Marketing or Ten to Forty-Nine Victims Enhancement

The Sentencing Guidelines call for a two-level enhancement if a defendant used mass-marketing to commit the offense or the offense involved between ten and forty-nine victims. U.S.S.G. § 2B1.1(b)(2)(A).

In the appellants' brief, they state that their scheme involved "ordinary, everyday 'cold-calling,'" sending "mailings ordinarily sent by all types of small businesses," and "old-fashioned knocking on doors." They conclude that this conduct is not the type of illegal activity contemplated by the Sentencing Guidelines.

The appellants' admitted conduct falls squarely within the Sentencing Guidelines' definition of "mass-marketing," which is a plan to solicit "by telephone, mail, internet, or other means to induce a large number of people to purchase goods or services … ." U.S.S.G. § 2B1.1 cmt. app. n.(4)(A); *see also United States v. Christiansen*, 594 F.3d 571, 576 (7th Cir. 2010); *United States v. Heckel*, 570 F.3d 791, 794 (7th Cir. 2009). The appellants hired telemarketers to sell their services by phone, paid a company to mail thousands of fliers to residents in Chicago, and directed employees to canvass neighborhoods. The district court made no mistake in finding that the appellants used mass-marketing and applying this sentencing enhancement.

### F.  Organizer or Leader Enhancement for John Sullivan

Finally, John Sullivan argues that the district court erred in its finding that he was the organizer or leader of a criminal activity because the scheme involved less than five participants

and it was not an otherwise extensive organization. Or, if we disagree with his characterization of the criminal activity, he argues that he did not lead or recruit the other members of the scheme; his brother did.

The Sentencing Guidelines provide for a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). A criminal activity that had less than five participants but "used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1 cmt. app. n.(3); *see also United States v. Tai*, 41 F.3d 1170, 1174 (7th Cir. 1994). "[I]f a head count is the sole basis for an 'otherwise extensive' finding, the heads counted must add up to something greater than five." *Tai*, 41 F.3d at 1174. Here, the appellants used the unknowing services of more than five outsiders to implement their fraud. They used at least three employees, Kelliher, Browning, and Rooney; two mortgage brokers, Kleinberg and Petropoulos; one subcontractor, Koterba; one lawyer to change the business entity records; several title companies to close the refinance loans; and a direct mail company to mail their advertisements. The appellants' fraud scheme easily qualifies as an extensive criminal activity.

We also reject John Sullivan's assertion that his brother was the leader of the scheme, not him. The organizer or leader enhancement is appropriate if a defendant exercised "control over others" or was "responsible for organizing others for the purpose of carrying out the crime." *Knox*, 624 F.3d at 874 (quoting *United States v. Wasz*, 450 F.3d 720, 729 (7th Cir. 2006)). Browning testified that John and Daniel took the lion's share of

the money from the refinance jobs and both exercised control over the operations at J&D Home Services. But, he testified that John was the boss of the operation and Daniel was second in command. The district court's characterization of the scheme as extensive, as well as its determination of John's leadership role were both proper.

## CONCLUSION

The district court reasonably estimated the amount of loss in determining the appellants' offense level and properly enhanced the offense level further for the other five aggravating factors. Accordingly, we AFFIRM the appellants' sentences.