In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 13-2929, 13-3008 & 14-2297

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEMETTRIS CRUSE, DANIEL MCCLAIN,
and CHARLES HENDERSON,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 11-Cr-191 — **Rudolph T. Randa**, *Judge.*

ARGUED NOVEMBER 12, 2014 — DECIDED NOVEMBER 3, 2015

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Demettris Cruse, Daniel McClain, Charles Henderson, and eight others were indicted for their involvement in a long-running conspiracy to distribute controlled substances in Milwaukee. The indictment centered on the activities of two street gangs that controlled the crack-cocaine trade in adjacent neighborhoods on the city's northwest side. The eight coconspirators not party to this

appeal pleaded guilty and agreed to cooperate with the government.

Henderson also negotiated a plea bargain. He agreed to plead guilty to the conspiracy charge but only to a subset of the drugs listed in the indictment (that is, crack and marijuana but not powder cocaine). In exchange the government would recommend the mandatory minimum sentence. Henderson pleaded guilty pursuant to this agreement and the court imposed the recommended sentence. But the government neglected to file an information narrowing the charged drug types as contemplated by the plea agreement. Henderson argues that this mistake undermines the validity of his plea. We disagree. Henderson understood the charge against him and the possible penalty, and the judgment conforms precisely to the terms of the agreement. We see no reason to unwind the plea.

A jury found Cruse and McClain guilty. They argue that the trial was contaminated by a host of errors: two *Batson* violations, improperly admitted hearsay, and two faulty jury instructions (one about the distinction between a buyer-seller relationship and a conspiracy, and the other about the scope of coconspirator liability). McClain also claims that the evidence was insufficient to convict him. Only one of these arguments merits relief, and only with respect to one defendant: the absence of a buyer-seller instruction violated Cruse's right to a fair trial, so we vacate his conviction and remand for retrial. The judgments against Henderson and McClain are affirmed.

## I. Background

By the mid-1990s, two gangs controlled the drug trade in and near the Westlawn housing project on Milwaukee's northwest side. The Westlawn gang operated in the housing project itself, and Six Trey controlled the territory in the nearby neighborhood around the intersection of 63rd Street and West Bobolink Avenue. The two gangs operated just a few blocks apart and were generally—though not always—on friendly terms.

Both gangs operated similarly. Six Trey's membership consisted primarily of people who had grown up together near 63rd and Bobolink. The gang had no formal structure, but it held meetings during which its members would discuss who would sell drugs and also mete out punishment (usually in the form of beatings) to those who broke the gang's norms against cheating and stealing. Six Trey also maintained tight control over its territory; if an outsider encroached and tried to sell drugs, Six Trey members would page each other using a distress code, and when reinforcements arrived, they'd beat and rob the intruder. The benefits of membership included money, protection from rival gangs, and the ability to sell drugs in Six Trey's territory.

Most of Westlawn's members had also known each other since childhood ("we was all like brothers," according to one Westlawn member). The gang had no formal leadership hierarchy, but different members had different roles, such as supplying drugs, delivering drugs, providing security, and organizing gambling. Outsiders were robbed and beaten if they tried to sell drugs in Westlawn's territory. The benefits of membership included protection, access to drugs, tips about police activity, and the assurance that members

wouldn't snitch on one another (though it was acceptable to cooperate with the police on non-gang-related matters). The gang also gave its members things like shoes and TVs, and supplied money to incarcerated members.

The Drug Enforcement Administration ("DEA") began investigating Westlawn and Six Trey in 2004. In 2009, 18 gang members were indicted on drug-conspiracy charges. Two years later on September 7, 2011, a federal grand jury returned a second indictment against 11 additional gang members, including Cruse, McClain, and Henderson. This indictment alleged a single count of conspiracy to possess with intent to distribute and to distribute controlled sub-stances in violation of 21 U.S.C. §§ 841(a)(1) and 846. The indictment also alleged that the offense involved at least 5 kilograms of powder cocaine, 280 grams of crack cocaine, and an unspecified amount of marijuana. The charged quantities of powder and crack cocaine were each inde-pendently sufficient to trigger a ten-year mandatory mini-mum sentence. *See id*. § 841(b)(1)(A)(ii)–(iii).

The eight coconspirators not party to this appeal pleaded guilty and agreed to cooperate with the government. Hen-derson, a relatively low-level crack dealer affiliated with Westlawn, also pleaded guilty. On appeal he challenges the validity of his plea; we'll provide the relevant background for his argument later in this opinion.

The case against Cruse and McClain proceeded to jury trial. The government's case rested primarily on the testimo-ny of seven cooperating gang members: Shywan Mathis, Willie Mohomes, Michael Riley, Aaron Seymore, and Corey Winters, all of whom self-identified as members of Westlawn; Kendall Burton, a member of Six Trey who also

sold drugs in Westlawn; and Kenyounta Harvester, who didn't consider himself a member of either gang but sold large quantities of drugs to their members. All of these witnesses except Mathis and Harvester were charged in the 2009 indictment and pleaded guilty. Mathis was charged in the 2011 indictment (along with Cruse and McClain) and pleaded guilty. Harvester pleaded guilty to a separate conspiracy charge.

The witnesses described Cruse as a mid-level dealer who worked in Westlawn and McClain as a member of Six Trey and a high-level supplier of drugs in both the Six Trey and Westlawn territories. The jury found both guilty and in a special verdict found that the conspiracy involved at least 5 kilograms of powder cocaine or 280 grams of crack. Cruse was sentenced to 240 months, the mandatory minimum. McClain was sentenced to 252 months.

## II. Discussion

Henderson asks us to vacate his conviction and remand to permit him to withdraw his guilty plea. McClain and Cruse raise several common claims of trial error and a few individual arguments as well. We'll begin with Henderson's appeal and then move to the arguments raised by McClain and Cruse.

### A. Henderson's Appeal

For about ten years prior to his arrest, Henderson sold drugs in Westlawn, mostly "dime bags" ($10 packets) of crack cocaine. In a written plea agreement, Henderson agreed to plead guilty to the conspiracy charge, but only with respect to two of the three drug types alleged in the indictment. He would admit to conspiring to distribute at

least 280 grams of crack and an indeterminate amount of marijuana, but not powder cocaine.

To implement this agreement, the government agreed to file an information identical to the September 2011 indictment except that it would eliminate the reference to 5 kilograms of powder cocaine. In exchange for Henderson's guilty plea, the government agreed to recommend the ten-year minimum sentence required by § 841(b)(1)(A) and oppose any guidelines sentence enhancements, most notably a two-level increase for Henderson's possession of a firearm. *See* U.S.S.G. § 2D1.1(b)(1) (2011).

Henderson pleaded guilty pursuant to this agreement, and at sentencing the judge accepted the government's recommendation and imposed the minimum sentence of ten years. The judge also granted the government's motion to dismiss the September 2011 indictment. Before the court entered judgment, however, the parties discovered that the prosecutor had neglected to file an information narrowing the charged drug types as contemplated by the plea agreement. Henderson moved to withdraw his guilty plea. Alternatively, he sought specific performance of the plea agreement.

The judge declined to allow plea withdrawal, noting that a guilty plea generally may not be withdrawn after sentence is imposed. *See* FED. R. CRIM. P. 11(e) ("After the court imposes sentence, the defendant may not withdraw a plea of guilty or nolo contendere, and the plea may be set aside only on direct appeal or collateral attack."). Although the court had not yet entered judgment, "[o]ral pronouncement of the sentence triggers the bar" under Rule 11(e), *United States v.*

*Vinyard*, 539 F.3d 589, 595 (7th Cir. 2008), so the judge concluded that he could not set aside the plea.

Instead, to remedy the obvious mistake, the judge vacated the dismissal of the original indictment and ordered the clerk to enter judgment adjudicating Henderson guilty of conspiracy as charged in count one, but only with respect to 280 grams of crack and an unspecified amount of marijuana, *not* the 5 kilos of powder cocaine listed in the indictment. The resulting judgment thus conforms precisely to the terms of the plea agreement and to Henderson's guilty plea.

The judge acknowledged that this remedy created a variance between the indictment and the judgment. A variance occurs when the proven elements of an offense are "narrower than the full scope of the charge in the sense that the charge states all and more than what is necessary to identify the offense and sufficient evidence is not introduced to support each of the excess allegations." *United States v. Willoughby*, 27 F.3d 263, 265 (7th Cir. 1994). Because "a prosecutor may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged," variances are not inherently problematic. *United States v. Bustamante*, 493 F.3d 879, 885 (7th Cir. 2007) (quotation marks omitted). Rather, a variance only calls a guilty plea or verdict into question if it prejudiced the defendant, such as by depriving him of fair notice of the charges against him or by creating the risk of double jeopardy. *See id*; *United States v. Neighbors*, 590 F.3d 485, 498 (7th Cir. 2009) ("[A] conspiracy to distribute crack cocaine is a subset of a conspiracy to distribute both crack cocaine and powder cocaine. Therefore, because the defendants had adequate notice of the government's allegations and suffered no

prejudice from this variance, we find that the jury's verdict should stand.").

Henderson does not argue that the variance caused him any prejudice.[1] After all, the judgment matched the plea agreement and was fully supported by the facts he admitted in the agreement and at his change-of-plea hearing. The upshot is that he got exactly what he'd bargained for—a ten-year sentence for the crime of conspiring to distribute controlled substances; namely, at least 280 grams of crack and an unspecified amount of marijuana.

Nonetheless, Henderson argues that the mix-up violated his right to due process. One basic requirement of due process is that "a plea of guilty must be intelligent and voluntary," *Brady v. United States*, 397 U.S. 742, 747 n.4 (1970), and a plea cannot be voluntary "unless the defendant received real notice of the true nature of the charge against him," *Henderson v. Morgan*, 426 U.S. 637, 645 (1976) (internal quotation marks omitted). Although departures from the plea procedures prescribed in Rule 11 are ordinarily reviewed for harmless error, *see* FED. R. CRIM. P. 11(h), a "[m]isunderstanding of the nature of the charge … is not harmless error," *United States v. Bradley*, 381 F.3d 641, 647 (7th Cir. 2004).

---

[1] At oral argument Henderson's attorney suggested that if a future Congress reduced sentences across the board for prisoners convicted of selling crack cocaine but denied the reduction to those convicted of selling powder cocaine, Henderson might be deemed ineligible. But how could that be? It's the judgment against Henderson that carries legal force, and the judgment only refers to crack cocaine and marijuana. Henderson was not convicted of any crime involving powder cocaine.

As we've noted, under Rule 11(e) the judge's hands were tied; he could not entertain Henderson's motion for plea withdrawal on the merits. So we resolve the voluntariness question by reference to the totality of the circumstances, as in the typical case of a defendant who seeks to withdraw his plea before sentence is imposed.[2] *See United States v. Moussaoui*, 591 F.3d 263, 278 (4th Cir. 2010) (assessing the voluntariness of the defendant's plea under the totality of the circumstances in a case in which review by the district court was barred by Rule 11(e)); *cf. Bousley v. United States*, 523 U.S. 614, 622 (7th Cir. 1998) (noting in the context of habeas review that a challenge about the petitioner's intelligent acceptance of a plea "can be fully and completely addressed on direct review based on the record created at the plea colloquy").

The voluntariness of a guilty plea turns on such factors as the complexity of the charge, the evidence proffered by the government, the adequacy of the plea colloquy, and the defendant's own statements. *Bradley*, 381 F.3d at 644–45. As a general matter, Henderson mentions the complexity of conspiracy law, but he does not seriously argue that he misunderstood the nature of the conspiracy charge against him or that his plea colloquy was inadequate. His real argument, it seems, is that his due-process rights were violated by virtue of the mutual mistake about the infor-

---

[2] The government suggests that we should review the district court's denial of Henderson's motion for abuse of discretion. But that approach would not only deny Henderson any review whatsoever of the voluntariness of his plea (since the district court was barred from reviewing it under Rule 11(e)) but also would contradict the text of Rule 11(e) itself, which expressly envisions that a guilty plea "may be set aside … on direct appeal." FED. R. CRIM. P. 11(e).

mation, even absent any prejudice. For support he relies primarily on *United States v. Bradley*. In that case the defendant was indicted on two counts, one for possession of crack with the intent to distribute and one for carrying a gun in relation to that drug-trafficking crime. *Id.* at 643. Pursuant to a plea agreement, he pleaded guilty to possessing (*without* intent to distribute) marijuana (*not* crack) and to carrying a firearm in relation to the crime of marijuana possession. *Id*. These departures were not mere inconsequential variances; they created a host of legal problems that went unnoticed by the defendant, the government, and the court. *Id*. at 646–47. Most importantly, since possession of *crack* with intent to deliver was listed in the indictment as the drug-trafficking predicate for the firearm-possession count, the defendant's intent to distribute *crack* was an essential element of the gun charge. *Id*. at 646. The government confessed error. *Id.* at 644. We concluded that the mutual mistake and the manifold confusion it had created meant that the defendant was entitled to withdraw his plea. *Id*. at 648.

Here, in contrast, there is no question that Henderson understood the nature of the conspiracy charge to which he was pleading guilty and how the facts he admitted related to that charge. *See McCarthy v. United States*, 394 U.S. 459, 466 (1969) ("[B]ecause a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts."). Likewise, there cannot have been any confusion about the minimum and maximum sentences. As we've noted, a person convicted of conspiring to distribute 280 grams of crack faces the same ten-year mandatory minimum as a person convicted of conspiring to distribute *both* 280 grams of crack cocaine *and* 5 kilograms of

powder cocaine.[3] *See* § 841(b)(1)(A)(vii) (using the conjunction "or" in the list of drug quantities triggering the ten-year mandatory minimum). And each would face a maximum penalty of life. § 841(b)(1)(A).

Accordingly, in notable contrast to *Bradley*, here there was no misunderstanding about the substantive elements of the offense, the agreed factual basis for those elements, or the applicable penalties. Instead, Henderson wants to use the government's inattentiveness as a basis to unwind his plea, even though he harbored no essential misunderstanding about the law or the facts. The government's mistake was unfortunate, but it did not vitiate the voluntariness of Henderson's plea.

## B. *Batson* Challenges

In one of their common arguments on appeal, Cruse and McClain claim that the government used its peremptory challenges to dismiss two black jurors based on their race in violation of the equal-protection rule announced in *Batson v. Kentucky*, 476 U.S. 79, 85–86 (1986). To prevail on this claim, the defendants must show that the government used its peremptory strikes with discriminatory *intent*; disparate *impact* does not violate the Equal Protection Clause. *See Hernandez v. New York*, 500 U.S. 352, 369 (1991) (plurality opinion).

---

[3] The overall quantity and type of drugs would be relevant to the Sentencing Guidelines recommendation. *See* U.S.S.G. § 2D1.1 cmt. n.7 (2011). But Henderson's presentence report only referred to crack cocaine and marijuana sales. If the government had reneged on its agreement and asked the court to attribute 5 kilograms of powder cocaine to Henderson in order to impose a guidelines sentence above the mandatory minimum, this would be a different case.

A *Batson* challenge proceeds in three steps.[4] First, the defendant must make a prima facie case that the peremptory strike was racially motivated. *Snyder v. Louisiana*, 552 U.S. 472, 476 (2008). Second, the government must articulate a race neutral explanation for the strike. *Id*. at 477. Finally, the court must determine whether the defendant has shown purposeful discrimination. *Id*. We review the district court's *Batson* findings for clear error. *Id*. On this standard of review, we will affirm unless "we arrive at a definite and firm conviction that a mistake has been made." *United States v. McMath*, 559 F.3d 657, 670 (7th Cir. 2009) (internal quotation marks omitted). This deference is appropriate because the best evidence of discriminatory intent often will be the credibility and demeanor of the government's attorney, and determinations about credibility and demeanor lie "peculiarly within a trial judge's province." *Snyder*, 552 U.S. at 477 (quoting *Hernandez*, 500 U.S. at 365).

There were four black jurors in the 33-person venire summoned for trial. The government used peremptory challenges to strike two of the four, Robert Albritton and Helen Callahan; the other two black jurors were seated on the jury.

The first two steps of the *Batson* inquiry are not contested. "[T]he burden at the *prima facie* stage is low, requiring only circumstances raising a suspicion that discrimination

---

[4] Discrimination by race, ethnicity, and sex is constitutionally prohibited in all jury selection, including by defendants (so-called "reverse *Batson*"). *See Georgia v. McCollum*, 505 U.S. 42, 59 (1992). For simplicity's sake, however, we will describe *Batson* doctrine in light of the posture of this case; namely, defendants alleging that the government used its peremptory strikes in a racially discriminatory manner.

occurred, even when those circumstances are insufficient to indicate that it is more likely than not that the challenges were used to discriminate." *United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005); *see also Johnson v. California*, 545 U.S. 162, 173 (2005). The defendants objected to the prosecutor's strikes against Albritton and Callahan, noting that they were struck even though they were not self-evidently unfavorable to the government. *Batson* Step Two requires the government to advance race neutral reasons for its strikes, but these reasons need not be persuasive (or even plausible) as long as they are not racially discriminatory. *United States v. Stephens*, 514 F.3d 703, 710 (7th Cir. 2008); *see also Purkett v. Elem*, 514 U.S. 767–68 (1995) (per curiam).

The prosecutor said she struck Albritton primarily because he wore a Bluetooth device in his ear throughout voir dire, and he also "seemed fairly disinterested in the proceedings." She offered several additional reasons as well: Albritton said he had once been addicted to drugs (he had been in recovery for nine years), his brother was an officer in the Milwaukee Police Department, and he was unemployed.

The prosecutor also offered multiple race neutral justifications for striking Callahan: she was "very precise" in her answers during voir dire (e.g., she said she was "61-and-a-half," and she specified, without prompting, that she had previously served on a "civil" jury); she missed a question even though it was written on a display board; and she described herself as "self-employed" (as a massage therapist). The prosecutor regarded this last point as problematic because the defendants were planning to claim "that they were self-employed at the time that they were actually dealing drugs."

This brings us to the heart of the matter—*Batson* Step Three. It's at this stage that "the persuasiveness of the justification becomes relevant … [and] the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Johnson*, 545 U.S. at 171. The court can consider the totality of the circumstances, measuring credibility by, "among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). If the court determines that the proffered justification for the strike was pretextual, it may infer discriminatory intent. *Snyder*, 552 U.S. at 485.

The judge found that the government's use of a peremptory strike against Albritton was not racially invidious, and we find no clear error in that conclusion. In particular, the judge concluded that Albritton's close relationship with a police officer (his brother) was a neutral, nonpretextual justification for the strike. The judge acknowledged that a relative of a police officer might be especially sympathetic to the government, but remarked that the relationship "could cut both ways." That wasn't error; the prosecutor might have plausibly believed that a juror with a close relative on a police force might hold police officers to an especially high standard or have nonrepresentative beliefs about what constitutes good police work.

The judge also credited the government's reliance on the fact that Albritton was a recovering drug addict. This was a drug-conspiracy case, after all, and it's a reasonable trial strategy to remove jurors with firsthand experience buying illegal drugs. There's a heightened risk that they would rely

on personal knowledge or find it difficult to evaluate the case dispassionately. Albritton told the court that his history of drug addiction would not prevent him from fairly serving on the jury, but the government was not required to take his word for it—that's what peremptory challenges are for.

Regarding the prosecutor's removal of Callahan, the judge said this:

> The argument that this involves employment, it involves -- she is self-employed -- and is going to be the crux of the Government's case, is less than persuasive. But I also think that it doesn't rise to the level of an improper motive. And that is placed in the context of the fact that we do have minorities on the jury. … [I] think it does impact back upon the motives of the Government when in fact there is a diverse panel to begin with.

The judge did not specifically address the prosecutor's other proffered justifications for striking Callahan.

The question for us is whether the court clearly erred in finding that the government's "self-employment" rationale was "less than convincing" but nevertheless nonpretextual. It's worth amplifying a point we made earlier: "The relevant question during the third step of the *Batson* inquiry is whether a strike was racially motivated. It follows that *Batson* and its progeny direct trial judges to assess the *honesty*—not the accuracy—of a proffered race-neutral explanation." *Lamon v. Boatwright*, 467 F.3d 1097, 1101 (7th Cir. 2006) (citations omitted). In other words, "the government's proffered reason for the strike need not be particularly

persuasive … so long as it is not pretextual." *United States v. George*, 363 F.3d 666, 674 (7th Cir. 2004); *see also Purkett*, 514 U.S. at 769 (noting that "the *genuineness* of the motive" is the focus of the inquiry, not the "*reasonableness* of the asserted nonracial motive"); *United States v. Montgomery*, 210 F.3d 446, 453 (5th Cir. 2000) ("[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based.") (quotation marks omitted).

It was not clear error for the judge to accept the prosecutor's "self-employment" rationale as nonpretextual, even after saying it was "less than persuasive." Despite his skepticism, the judge's ultimate conclusion—based on firsthand observations of the proceedings—remains entitled to deference. He relied in part on the fact that two black jurors remained on the jury, which is a valid (if not dispositive) factor. *See United States v. Grandison*, 885 F.2d 143, 147 (4th Cir. 1989) ("While the racial composition of the actual petit jury is not dispositive of a *Batson* challenge, neither [is] the district court precluded from considering it."); *see also United States v. Simon*, 422 F. App'x 489, 495 (6th Cir. 2011) ("While the final racial composition of a jury … [is] not determinative of whether a *Batson* violation occurred, [it is still] relevant to the totality of the circumstances.") (internal citations omitted); *United States v. Williams*, 610 F.3d 271, 284 (5th Cir. 2010) ("In light of the demographic composition of the jury and the differences between [a black venire member's] voir dire responses and those of [two white venire members], we discern no clear error … .").

Of course, the racial makeup of the venire and the final jury panel can be affected by factors outside the government's control—challenges for cause, strikes by defense counsel, juror availability, to name a few. But the government's "strike rate" *is* within its control, and it can sometimes be insightful. *See Coombs v. Diguglielmo*, 616 F.3d 255, 262 (3d Cir. 2010) (citing *Miller-El*, 545 U.S. at 241). The relevance of the final jury composition is enhanced where the government has peremptory strikes remaining but declines to use them to remove minority jurors. *See United States v. Canoy*, 38 F.3d 893, 900 (7th Cir. 1994) ("A number of circuits, including this one, have relied on the fact that the government waived available strikes and permitted members of a racial minority to be seated on a jury to support a finding that the government did not act with discriminatory intent in striking another member of the same minority group."); *see also id*. at 900–01 (collecting cases). That's what happened here, and this factor bolsters the judge's conclusion that the prosecutor did not use a peremptory strike against Callahan with discriminatory intent.

We caution, however, that the racial composition of the venire and the seated jury cannot be the sole consideration under *Batson*. The Equal Protection Clause is violated if even a single juror is excluded because of invidious racial discrimination. *Cf. Powers v. Ohio*, 499 U.S. 400, 409 (1991) ("An individual juror … possess[es] the right not to be excluded from [a jury] on account of race."). We see no indication here that the judge misunderstood this principle.

In the end, the defendants—from whom "the burden of persuasion regarding racial motivation never shifts," *United States v. McAllister*, 693 F.3d 572, 578 (6th Cir. 2012)—have

not persuaded us that the judge clearly erred in rejecting their *Batson* challenge to the prosecutor's peremptory strike against Callahan. They rely heavily on *McMath*, but we don't think that case controls. There, the prosecutor struck a black juror because of the "expression on his face," and the judge summarily denied the defendant's *Batson* challenge. *McMath*, 559 F.3d at 661. We held, following *Snyder*, 552 U.S. at 479, that "summary denial does not allow us to assume that the prosecution's reason was credible," *McMath*, 559 F.3d at 666. Here, in contrast, the judge did not rule summarily. We find no clear error.

## C. Hearsay Evidence

Special Agent James Krueger led the DEA's multiyear investigation of Westlawn and Six Trey. He testified that in the mid-2000s, the DEA gathered information about the two gangs through search warrants, controlled buys, and recorded phone calls. He explained that the effectiveness of these techniques waned as the years wore on because the gangs adapted their practices to evade detection. As a result, the September 2011 indictment was based primarily on evidence derived from "historical debriefs"—interviews with informants—along with "a little bit of surveillance."

Agent Krueger identified McClain and Cruse as targets of the investigation that produced the September 2011 indictment. The prosecutor then asked this question: "Did you receive information from confidential informants about the drug trafficking activities of Daniel McClain and Demettris Cruse?" McClain objected on hearsay grounds, noting that the government "[wi]ll have the informants present to testify, Judge." The judge overruled the objection, and Agent Krueger answered, "Yes, I did."

McClain argues that his objection to this question should have been sustained. We review evidentiary rulings for abuse of discretion and will reverse only if no reasonable person could have adopted the court's view of the matter. *United States v. Causey*, 748 F.3d 310, 316 (7th Cir. 2014). Moreover, reversal for evidentiary error will be appropriate only if the error affected the defendant's substantial rights, meaning that an average juror would have found the prosecution's case significantly less persuasive without the improper evidence. *Id*.

Hearsay is familiarly defined as an out-of-court statement offered to prove the truth of the matter asserted. *See* FED. R. EVID. 801(c). Whether a particular statement is hearsay "will most often hinge on the purpose for which it is offered." *United States v. Linwood*, 142 F.3d 418, 425 (7th Cir. 1998). As relevant here, "[w]e have recognized repeatedly that statements offered to establish the course of the investigation, rather than to prove the truth of the matter asserted, are nonhearsay and therefore admissible." *United States v. Taylor*, 569 F.3d 742, 749 (7th Cir. 2009) (internal quotation marks omitted). If the jury would not otherwise understand why an investigation targeted a particular defendant, testimony regarding a confidential informant's tip "could dispel an accusation that the officers were officious intermeddlers staking out [the defendant] for nefarious purposes." *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004).

Considered in context, Agent Krueger's answer to the question whether law enforcement had "received information" about drug trafficking by McClain and Cruse was just this sort of "course of investigation" testimony. McClain's attorney had emphasized in opening statement

that there would be no physical evidence of drug trafficking. The government was entitled to ask Agent Krueger how the DEA came to suspect McClain despite a lack of physical evidence. The question came amidst a litany of questions about the methods the DEA used to investigate the case: the preceding question concerned surveillance of Six Trey, and the subsequent one was about the use of search warrants. Agent Krueger's testimony explained *why* the police were investigating McClain; whether the informants' tips were *truthful* was beside the point. Indeed, as McClain's lawyer pointed out in objecting to the question, numerous informants were scheduled to testify against McClain at trial, and the jury would have ample opportunity to decide if they were credible.

As with all evidence, the probative value of the testimony must not be substantially outweighed by the risk of unfair prejudice. *See* FED. R. EVID. 403. But Agent Krueger's simple three-word answer ("Yes, I did") was a particularly innocuous use of course-of-investigation testimony, especially given that so many government cooperators later testified at trial.

For the first time on appeal, McClain argues that Agent Krueger's answer to this question violated his Sixth Amendment right to confront witnesses. It's true that the "informants" mentioned in the question were unidentified, so we do not know if they were the same cooperators who testified at trial. Because this objection was not preserved, however, McClain must shoulder the heightened burden of plain-error review. *United States v. Anderson*, 450 F.3d 294, 299 (2006). Even if there was error, he hasn't come close to showing that it affected his substantial rights, as required to

warrant reversal. *Id.* Seven cooperating witnesses testified that they engaged in drug transactions with McClain and gave the DEA information about this activity. They were subject to full cross-examination. In light of the abundant testimony from cooperating witnesses, it cannot reasonably be argued the verdict was influenced by Agent Krueger's affirmative answer to the question whether unidentified informants fingered McClain. *See id*. (rejecting a Confrontation Clause challenge because the defendants' substantial rights were not violated when five witnesses testified about their drug dealing at trial).

### D. Sufficiency of the Evidence

McClain challenged the sufficiency of the government's evidence in a Rule 29 motion for a judgment of acquittal. *See* FED. R. CRIM. P. 29(a), (c). He reprises this argument here. Our review is de novo. *United States v. Mohamed*, 759 F.3d 798, 803 (7th Cir. 2014). We view the evidence in the light most favorable to the government and will affirm if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Id*.

Conspiracy has two elements: (1) an agreement to commit an unlawful act; and (2) the defendant must have knowingly and intentionally joined that agreement. *United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006). The government can prove these elements with circumstantial evidence, though the Supreme Court has warned that "[i]n some cases reliance on [circumstantial] evidence perhaps has tended to obscure the basic fact that the *agreement* is the essential evil at which the crime of conspiracy is directed." *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975) (emphasis added).

McClain says that's exactly what happened here: The ev-

idence shows that he engaged in multiple buyer-seller transactions only, not that he participated in a conspiratorial agreement to distribute drugs. "Although every drug deal involves an unlawful agreement to exchange drugs, we've held that a buyer-seller arrangement can't by itself be the basis of a conspiracy conviction because there is no common purpose: The buyer's purpose is to buy; the seller's purpose is to sell." *United States v. Long*, 748 F.3d 322, 325 (7th Cir. 2014) (internal quotation marks omitted).

Whether the evidence establishes a conspiratorial agreement must ultimately be determined by the totality of the circumstances, and we conduct a "holistic assessment of whether the jury reached a reasonable verdict." *United States v. Brown*, 726 F.3d 993, 1002 (7th Cir. 2013). Still, we have recognized "a few *per se* rules." *Id*. For example:

> A reasonable jury can infer a conspiracy from evidence of a consignment relationship, or a relationship exhibiting three qualities: "multiple, large-quantity purchases, on credit." Other characteristics that distinguish a conspiracy from a buyer-seller relationship include "an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the other's business, or an agreement to warn of future threats to each other's business stemming from competitors or law-enforcement authorities."

*United States v. Jones*, 763 F.3d 777, 807 (7th Cir. 2014) (quoting *Brown*, 726 F.3d at 1002, 999).

The government introduced ample evidence showing that McClain knowingly participated in a long-running conspiratorial agreement to distribute drugs in the neighborhoods where the Six Trey and Westlawn gangs operated. Nearly all the witnesses described the two gangs as informal organizations that advanced their members' drug-trafficking activities by (among other things) keeping out intruders, enforcing conduct norms, and providing warnings about law enforcement. Testimony established that McClain was a member of Six Trey and a longtime, large-scale cocaine supplier within the organization, and also that he regularly supplied drugs to Westlawn gang members for resale in the housing project. This testimony was easily sufficient for the jury to find that he entered into a conspiratorial agreement.

Additionally, McClain's relationship with his middlemen—particularly, Melvin Cooper (from 1996 to 2001) and Dawan Howard (from 2007 onward)—supports the conspiracy conviction. Cooperation with a middleman is a conspiracy per se because the dealer and the middleman have agreed to work together to distribute drugs to third parties. *See United States v. Bey*, 725 F.3d 643, 649–50 (7th Cir. 2013); *United States v. Payton*, 328 F.3d 910, 911 (7th Cir. 2003) (collecting cases). Four witnesses—Mathis, Mohomes, Riley, and Winters—testified that McClain used Cooper and Howard as his middlemen to sell drugs, and that testimony was independently adequate to satisfy both elements of the conspiracy charge.

It's true that the indictment did not name Cooper or Howard as coconspirators. But it alleged a conspiracy among certain identified members of the Westlawn and Six Trey gangs and other "persons known and unknown." The

jury was entitled to believe the testimony about McClain's use of middlemen, and that testimony supports his conviction even though they were not named as coconspirators in the indictment. *See United States v. Avila*, 557 F.3d 809, 816 (7th Cir. 2009) ("Proving that [the defendant] joined the conspiracy alleged in the indictment does *not* require that the government prove he conspired with the *individuals* named in the indictment. … [The government] need only prove that the defendant conspired with *anyone* to commit the crime charged in the indictment.").

McClain responds with a general attack on the credibility of the government's witnesses, many of whom received sentence reductions in exchange for their agreement to testify. But evaluating the credibility of the witnesses is the jury's job. McClain also notes—correctly—that membership in a gang is not definitive proof of conspiracy. *See United States v. McKay*, 431 F.3d 1085, 1093 (8th Cir. 2005). But the jury was entitled to infer from McClain's membership in the Six Trey gang and his long history of supplying drugs to middlemen for redistribution in the Six Trey and Westlawn territories that he intentionally entered into a conspiratorial agreement.

McClain's fallback argument is that the government failed to prove his involvement in a single conspiracy stretching from 1996 to 2011, as described in the indictment. At most, he argues, the evidence established that he participated in multiple, unconnected conspiracies. This is essentially an argument that a fatal variance exists between the conspiracy charged and the conspiracy (or conspiracies) proven.

As we've already explained, "[a] variance arises when the facts proved by the government at trial differ from those alleged in the indictment." *Avila*, 557 F.3d at 815 (quoting *United States v. Stigler*, 413 F.3d 588, 592 (7th Cir. 2005)); *see also id.* ("We treat a conspiracy variance claim as nothing more than a challenge to the sufficiency of the evidence."). To prevail on this claim, McClain must establish that (1) the evidence at trial was insufficient for a rational juror to find that he belonged to a single conspiracy (even if it could also have been interpreted to show multiple conspiracies); and that (2) he was prejudiced by the variance. *Id*. Prejudice in this context generally means that the variance either unfairly surprised the defendant, created a risk of subsequent prosecution for the same offense (this is only an issue when multiple conspiracies were charged but only one was proven), or threatened to confuse the jury. *Id*.

"[B]y their very nature, drug conspiracies are loosely-knit ensembles." *United States v. Townsend*, 924 F.2d 1385, 1391 (7th Cir. 1991). Here, as we've noted, the Westlawn and Six Trey gangs had their own identities, members, and territories, and they occasionally feuded. But some members, including McClain, moved freely between the gangs to supply the drug trade within their respective territories.[5] Viewed in the light most favorable to the government, the

_____

[5] The government frames the Westlawn and Six Trey conspiracy as a "hub and spoke" conspiracy, but our comment in *United States v. Townsend*, 924 F.2d 1385, 1392 (7th Cir. 1991), bears repeating: "The fact that we can squeeze a group into a hypothetical organizational chart says little about whether a single agreement exists between the members of the group," and "organizational construct[s] … don't eliminate the need to inquire directly into whether the defendants had a mutual interest in achieving the goal of the conspiracy."

evidence of a loose connection between the two gangs—an overlap in membership and evidence of cooperation (such as McClain's use of two Westlawn members as middlemen)—is sufficient to support a single conspiracy. *See United States v. Cerro*, 775 F.2d 908, 914 (7th Cir. 1985) (describing "mutual support" conspiracies that "require at most that the various arrangements and transactions alleged to constitute or manifest a single conspiracy contribute to the success of the overall undertaking and in that sense reinforce each other"); *United States v. Longstreet*, 567 F.3d 911, 919 (2009) ("So long as the evidence demonstrates that the co-conspirators embraced a common criminal objective, a single conspiracy exists, even if the parties do not know one another and do not participate in every aspect of the scheme.") (quotation marks omitted).

But even if the evidence supported only smaller, unconnected conspiracies as McClain argues, he hasn't shown prejudice. The indictment provided adequate notice of the nature of the government's evidence against McClain, and he does not argue that he was the victim of unfair surprise at trial. All seven of the government's coconspirator witnesses testified about McClain's role as a drug supplier in the Six Trey and Westlawn territories. There was little risk that the jury would have been confused about "spillover" evidence describing a distinct conspiracy in which he did not participate. *See Bustamante*, 493 F.3d at 887. This argument also fails.

### E. Buyer-Seller Instruction

As we've noted, an agreement to buy or sell drugs is not itself conspiratorial. Rather, the law of conspiracy "punish[es] criminal objectives beyond the sale itself—most

typically, the parties' agreement subsequently to distribute the drugs exchanged." *United States v. Askew*, 403 F.3d 496, 503 (7th Cir. 2005). McClain and Cruse asked the district court to instruct the jury about the distinction between a buyer-seller relationship and a conspiracy. Specifically, they requested Seventh Circuit Pattern Criminal Jury Instruction 5.10(A):

> A conspiracy requires more than just a buyer-seller relationship between the defendant and another person. In addition, a buyer and seller of [cocaine] do not enter into a conspiracy to distribute [cocaine] simply because the buyer resells [cocaine] to others, even if the seller knows that the buyer intends to resell the [cocaine].

The government objected, and the judge declined to give the instruction. Both defendants raise this issue on appeal.

We review the denial of a requested jury instruction de novo. *United States v. Love*, 706 F.3d 832, 838 (7th Cir. 2013). "Defendants are not automatically entitled to any particular theory-of-defense jury instruction." *United States v. Walker*, 746 F.3d 300, 307 (7th Cir. 2014). Rather,

> [a] defendant is only entitled to a jury instruction that encompasses [a] theory of the defense if (1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to

include the instruction would deny the de-
fendant a fair trial.

*Id*. (internal quotation marks and alteration omitted). Only
the second and fourth steps in the analysis are contested
here: Did the evidence support Cruse's or McClain's request
for a buyer-seller instruction, and if so, were they denied a
fair trial because the jury was not instructed on this theory?

We've said many times that "district courts should give a
'buyer-seller' instruction … where the jury could rationally
find, from the evidence presented, that the defendant merely
bought or sold drugs but did not engage in a conspiracy."
*Love*, 706 F.3d at 838 (citing *United States v. Chavis*, 429 F.3d
662, 671–72 (7th Cir. 2005)); *United States v. Thomas*, 150 F.3d
743, 746 (7th Cir. 1998) (per curiam) ("If a jury rationally
could find in the defendant's favor on some material issue,
then the jury must be instructed on that subject."); 7TH CIR.
PATTERN CRIM. JURY INSTRUCTIONS 5.10(A) cmt. (2012) ("This
[buyer-seller] instruction should be used only in cases in
which a jury reasonably could find that there was only a
buyer-seller relationship rather than a conspiracy.").

Of course, there will be cases in which the evidence does
not support the reasonable inference that the defendant was
merely a buyer-seller; an irrelevant instruction would only
serve to confuse the jury and need not be given. *See Love*,
706 F.3d at 839. We have frequently upheld district courts
that have declined to give the instruction in the face of
strong evidence of a conspiratorial agreement. *See, e.g., id.*
(holding no buyer-seller instruction was required in a case in
which the evidence included phone logs, videotapes, audio
recordings, and testimony from an informant and law-
enforcement officers); *Johnson*, 437 F.3d at 669 (finding no

plain error where the government introduced audio record-ings showing that the defendant acted as a broker for his coconspirator, as well as evidence from controlled buys); *Askew*, 403 F.3d at 504 (finding no plain error where the record included direct surveillance of drug deals, evidence that the defendant received drugs at below-market prices, and other evidence linking the defendant to his coconspira-tor); *United States v. Fort*, 998 F.2d 542, 543 (7th Cir. 1993) (holding that the instruction was not necessary when there was wiretap and surveillance evidence documenting the defendant's cooperation with his coconspirator).

The government argues as a threshold matter that Cruse and McClain were not entitled to a buyer-seller instruction because they tried to portray themselves as "innocent by-standers." The government reads *Love*, *Johnson*, *Askew*, and *Fort* as establishing a general principle that a defendant who denies selling drugs is *never* entitled to buyer-seller instruc-tion. That's not correct. As we've just noted, in each of those cases we reviewed the entire record and upheld the denial of the instruction based on strong, direct evidence of conspira-cy (e.g., videotapes, audio recordings, surveillance, con-trolled buys, informant testimony) and the absence of any record support for a buyer-seller relationship. Moreover, and importantly, the government's understanding of these cases is in tension with *Mathews v. United States*, 485 U.S. 58, 63–64 (1988), which holds that inconsistent defenses are permissi-ble. For these reasons, we think the government has misread this line of cases.

With the legal background now in place, we begin with Cruse. Four witnesses—Seymore, Mathis, Winters, and Riley—testified that they engaged in drug transactions with

Cruse. But a reasonable jury could have found that these deals were merely buyer-seller transactions. None of the drug sales had any of the usual markers of conspiracy, such as consignment arrangements, profit sharing, or agreements regarding further distribution of the drugs. Seymore and Mathis said they bought drugs from Cruse but always paid in cash upon delivery. Winters and Riley testified that they sold drugs to Cruse and he normally paid in full upon delivery; only occasionally did they sell drugs to him on credit. Occasional credit sales are not necessarily inconsistent with a buyer-seller relationship. *See United States v. Johnson*, 592 F.3d 749, 755 n.5 (7th Cir. 2010). Repeated, large-scale sales of drugs on credit are a sufficient basis from which a jury can infer a conspiratorial agreement, but we cannot conclude that the evidence of sporadic purchases on credit defeats Cruse's request for a buyer-seller instruction.

The government counters that Cruse could not have been a mere buyer-seller because he taught Winters how to cook powder cocaine into crack, and this sharing of advice can indicate a conspiracy. *See Jones*, 763 F.3d at 807. But the "cooking lesson" took place before the start date of the conspiracy, at a time when Winters was in seventh grade and Cruse was just a few years older. A reasonably jury could conclude that Cruse's tutoring session was not evidence of an agreement regarding the distribution of drugs years later.

The government also suggests that since Cruse was a member of Westlawn, he was part of the gang's drug-distribution network regardless of the specific sales described at trial. But Cruse's status with respect to Westlawn was disputed. Winters, who self-identified as a Westlawn member, answered "no" when asked if Cruse was a member

of Westlawn. (Winters said he sold drugs to Cruse because they had grown up together.) Riley said Cruse was a Westlawn member, but he also explained that he considered everyone who grew up in the Westlawn housing projects to be a member of the gang. Seymore's testimony on this point was ambiguous; he said that Cruse was "affiliated" with Westlawn but was allowed to sell drugs in the neighborhood because he "grew up in that area."

In short, the testimony about Cruse's relationship to the Westlawn gang was sufficiently equivocal that the jury might reasonably have rejected the government's argument that Cruse was a gang member. Alternatively, the jury might reasonably have concluded that even if Cruse was a member, "membership" was so informal (everyone from the neighborhood was "in" by default) that it did not suggest a conspiratorial agreement, but instead only a buyer-seller relationship. *See Avila*, 465 F.3d at 798 ("The government has confused gang membership with membership in a conspiracy … ."). On this record we think Cruse has shown that the evidence supported an inference that he engaged in buyer-seller transactions.

McClain is a different story. Burton testified that McClain was a member of Six Trey and served as the gang's major drug supplier. Mohomes testified that he regularly saw McClain selling drugs out of a drug house operated by Six Trey members. Even more decisively, Mohomes, Riley, Mathis, and Winters all testified that Cooper and Howard worked as middlemen for McClain. As we've explained, the relationship between middlemen and their superiors is per se conspiratorial because it is an agreement to cooperate to sell drugs. *See Thomas*, 150 F.3d at 745 (equating conspiracy

with a "business partners[hip]"). Because a middleman and his principal are on the same side of a transaction, they cannot have a buyer-seller relationship. *Payton*, 328 F.3d at 912 ("The 'buyer-seller' argument is irrelevant … [if] the conspirators are on the same side of the sale.").

Although "[i]n a dubious case it may often be better to give the proposed instruction and let the jury sort it out," *United States v. Meyer*, 157 F.3d 1067, 1076 (7th Cir. 1998), a defendant is not entitled to a theory-of-the-defense instruction unless the evidence supports the theory. The robust and uncontroverted evidence regarding McClain's use of middlemen made the buyer-seller instruction inapposite. *See Fort*, 998 F.2d at 544–45 (holding that the buyer-seller instruction was not required when the alleged conspiracy was between the defendant and a "broker" who arranged drug sales on his behalf). The judge properly denied McClain's request for the instruction.

This brings us back to Cruse. Was he denied a fair trial when the judge refused to give the buyer-seller instruction when the evidence supported it? We have generally answered this question "yes": If "the evidence was such that a reasonable jury could have found that [the defendant] was merely a buyer from the conspiracy, the failure to give a buyer-seller instruction denied [him] a fair trial." *Meyer*, 157 F.3d at 1075; *see also United States v. Gee*, 226 F.3d 885, 895 (7th Cir. 2000) ("We have no way of knowing whether, had the jury understood the distinction between a conspiracy and a buyer-seller relationship, it would still have convicted [the defendants] of conspiracy.").

An uninstructed jury is not likely to be able to intuit the distinction between an arm's-length agreement to buy or sell drugs and a conspiratorial agreement to distribute drugs.

For this reason, we have never found a failure to give the buyer-seller instruction to be harmless. And the error was not harmless here. Cruse is entitled to a new trial with the benefit of the buyer-seller jury instruction.

### F. Drug-Quantity Instruction

McClain and Cruse raise a second claim of instructional error, this one related to the special verdict form that the jury used to find the type and quantities of drugs attributable to the defendants.[6] The jury was told that Cruse and McClain were responsible for "the amount of cocaine involved in the agreement, and all amounts involved in all acts of the co-conspirators committed in furtherance of the conspiracy." This instruction omitted the *Pinkerton* principle that coconspirator liability only extends to those criminal acts that (1) were reasonably foreseeable to the defendants; and (2) occurred during the time that they were members of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946); 7TH CIR. PATTERN CRIM. JURY INSTRUCTIONS 5.11 (2012).

---

[6] Under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 133 S. Ct. 2151 (2013), facts that increase either a statutory maximum or trigger a mandatory minimum sentence must be found beyond a reasonable doubt by the jury. *Alleyne* was decided several months after this trial. Ordinarily, a "new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases … pending on direct review … , with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quoting *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987)). This creates no complication here because the jury used a special verdict form to find the drug types beyond a reasonable doubt (under *Apprendi*, its findings could have increased the statutory maximums).

The defendants did not object to the instruction, so our review is for plain error only. Everyone agrees that the jury should have been instructed on the *Pinkerton* doctrine. But the government argues that we need not correct the error because it did not seriously affect the fairness, integrity, or public reputation of the proceedings, as required to win reversal on plain-error review. *United States v. Anderson*, 450 F.3d 294, 299 (7th Cir. 2006).

Because we're vacating Cruse's conviction on other grounds, we focus our attention on McClain. As we've already explained (back in our discussion of Henderson's plea agreement), drug quantity is not an element of a drug conspiracy under § 841(a)(1). *See United States v. Martinez*, 301 F.3d 860, 865 (7th Cir. 2002). Accordingly, the *Pinkerton* instructional error does not cast doubt on McClain's conspiracy conviction. Rather, the remedy for the error would be resentencing under the default drug-conspiracy penalty provision, § 841(b)(1)(C). *See United States v. Delgado-Marrero*, 744 F.3d 167, 191 (1st Cir. 2014); *United States v. Daniels*, 723 F.3d 562, 572 (5th Cir. 2013).

The pertinent question is the effect of the *Pinkerton* instructional error on the jury's finding that the conspiracy involved at least five kilograms of cocaine or 280 grams of crack for purposes of the penalty scheme in § 841(b)(1)(A). We're confident that the error had no effect at all. Even with the more narrowly focused *Pinkerton* instruction, the jury would have attributed more than 5 kilograms of powder cocaine or 280 grams of crack to McClain. Five of the six cooperating witnesses—Winters, Burton, Mathis, Mohomes, Harvester, and Riley—testified that they engaged in drug transactions directly with McClain or through his middle-

men, and their drug-quantity estimates alone were sufficient to trigger the mandatory minimum sentence under § 841(b)(1)(A). Because McClain was personally responsible for such a large quantity of drugs during the course of this long-running conspiracy, there is no reason to doubt that the threshold limits set forth in § 841(b)(1)(A) were met, regardless of the failure to instruct on the *Pinkerton* principle of reasonable foreseeability. The error did not affect McClain's substantial rights.[7]

### III. Conclusion

Summing up, we AFFIRM the judgments against Henderson and McClain; as for Cruse, we VACATE the judgment and remand for a new trial.

---

[7] McClain also argues in a footnote to his reply brief that the court miscalculated his recommended sentence under the Sentencing Guidelines. However, "[a]rguments raised for the first time in a reply brief are waived." *Damato v. Sullivan*, 945 F.2d 982, 988 n.5 (7th Cir. 1991) (quotation marks omitted).