In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-2023

DANIEL SULLIVAN,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 3067 — **Rubén Castillo**, *Chief Judge*.

ARGUED NOVEMBER 14, 2017 — DECIDED DECEMBER 8, 2017

Before BAUER, EASTERBROOK, and SYKES, *Circuit Judges*.

PER CURIAM. A jury found Daniel Sullivan and his brother John guilty of two counts of committing wire fraud in connection with a home-remodeling scheme they operated for several years. The district judge sentenced both brothers to 168 months' imprisonment, and on direct appeal we affirmed their sentences. *See United States v. Sullivan*, 765 F.3d 712 (7th Cir. 2014). They then filed separate pro se collateral challenges under 28 U.S.C. § 2255, each contending that their attorneys

were constitutionally ineffective. The district judge denied both § 2255 motions without holding an evidentiary hearing. The present appeal concerns the denial of Daniel's motion.

We granted Daniel a certificate of appealability on his claims that his attorneys rendered constitutionally ineffective assistance by failing to (1) raise an objection under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the exclusion of potential jurors based on race; and (2) hire an expert witness to testify about the amount of loss attributable to Daniel for purposes of the Guidelines. We affirm.

## I. BACKGROUND

Our opinion from the Sullivans' direct appeal details the case's background. The brothers operated various companies that offered remodeling services in Chicago. Through subcontractors they performed legitimate work for clients who paid in cash, but they padded their profits by duping dozens of elderly, unsophisticated homeowners into refinancing their homes to pay substantial sums for work they never intended to finish. At one point the Circuit Court of Cook County permanently enjoined both John and a company the brothers co-owned from engaging in the home-repair business in the city of Chicago; the brothers, however, circumvented the injunction by creating a new company and installing an employee as its nominal president. They also falsified contracts to hide their fraudulent activity.

In September 2010 a grand jury charged the Sullivans with wire fraud, and a year later they were tried together in front of Judge Blanche Manning. The jury heard testimony from

victimized homeowners, the brothers' employees, a subcontractor they used for some projects, and various bankers and investigators. The jury found the defendants guilty of two counts of wire fraud each.

After Judge Manning retired, the case was transferred to Judge Rubén Castillo, who found both brothers responsible for causing about $750,000 in losses to their victims and sentenced them to 168 months' imprisonment each.

The Sullivans each appealed, arguing that the district judge erred in calculating the amount of loss for purposes of the Guidelines and in imposing various upward adjustments based on the judge's findings that the scheme involved vulnerable victims (U.S.S.G. § 3A1.1(b)(1)), the violation of a prior judicial injunction (*id*. § 2B1.1(b)(9)(C)), sophisticated means (*id*. § 2B1.1(b)(10)(C)), and mass marketing (*id*. § 2B1.1(b)(2)(A)). John also challenged an adjustment he received for being an organizer or leader of the scheme (U.S.S.G. § 3B1.1(a)). We rejected all these contentions and affirmed both brothers' sentences.

John and Daniel then filed pro se motions for collateral relief under 28 U.S.C. § 2255, and for the first time their cases diverged. Daniel argued that his attorney rendered constitutionally ineffective assistance by failing to (1) object to the exclusion of jurors on a potentially discriminatory basis, (2) hire an expert witness to testify about the loss amount.

Judge Castillo summarily dismissed Daniel's motion in a one-paragraph order that reads in its entirety as follows:

> After a careful review of this recently filed petition under 28 U.S.C. § 2255, in light of the trial record and appeal in this case, this Court easily

concludes that Petitioner has not established any non-waived constitutional error in these proceedings. For these reasons, this petition is denied with prejudice. Petitioner has not established the need for a hearing. Finally, the Court denies a certificate of appealability for this order.

We granted Daniel a certificate of appealability on both issues raised in his motion. *See* 28 U.S.C. § 2253(c)(2).

## II.  DISCUSSION

Daniel, now represented by newly recruited counsel, argues that the district court erred in denying his request for an evidentiary hearing on his claims that his trial attorneys rendered ineffective assistance—first by failing to object to the supposed exclusion of Hispanics and African Americans from the jury and, second, by failing to hire an expert to testify about the loss amount. A district court must conduct an evidentiary hearing before denying a motion for collateral relief unless the record "conclusively show[s] that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *Anderson v. United States*, 865 F.3d 914, 919 (7th Cir. 2017). This court reviews for abuse of discretion a district court's decision to deny an evidentiary hearing. *Mitchell v. United States*, 846 F.3d 937, 941 (7th Cir. 2017).

### A. *Batson* Issue

We first consider Daniel's contention that his attorneys rendered ineffective assistance when they did not object un-

der *Batson* that the government systematically excluded Hispanics and African Americans from the jury. The record contains no statistics about the racial composition of the venire, so Daniel focuses on the government's use of a peremptory challenge against an African-American man who was a criminal-defense lawyer.

The potential juror came up at the start of the second day of jury selection, when the government's attorney, Patrick Pope, disclosed to the judge that one of his colleagues had spoken briefly with a member of the venire outside the courtroom. Pope, who did not know the potential juror's name, initially described him as a paralegal who worked for an attorney representing Rod Blagojevich during his criminal trial. Pope explained that his colleague had recognized the potential juror from Blagojevich's trial and had briefly discussed Blagojevich's sentencing with him. When asked to describe the potential juror, Pope said that he was a "large African-American male." The judge's clerk then identified him as attorney Keenan Saulter.

Saulter's responses during jury selection were unremarkable. He confirmed that he was an attorney employed at a law firm. He said that he was "very close to multiple criminal lawyers and some prosecutors" but denied that those relationships would prevent him from being impartial. He also affirmed that he "absolutely" would follow the judge's instructions about the law. Daniel's lawyers asked no follow-up questions of Saulter, and John's lawyer asked him only to clarify the extent to which he had been a party to a lawsuit.

The government, without objection from the defense, used one of its peremptory strikes to remove Saulter from the jury pool. Later, at the end of jury selection, the district judge

quipped that the parties "didn't get to the lawyer," to which Pope replied: "Certainly not a defense lawyer and certainly not with where his previous employment was."

Before he can show that his attorneys were ineffective in failing to object to Saulter's removal, Daniel first needs to show that such an objection would have had potential merit. *Batson* establishes a three-step process for challenging a peremptory strike. *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 328–29 (2003). First, the defendant must make out a prima facie case that a strike was exercised on the basis of race. *Id.* at 328. This requires a defendant to point to evidence "raising a suspicion that discrimination occurred." *United States v. Cruse*, 805 F.3d 795, 807 (7th Cir. 2015) (quoting *United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005)). If the defendant clears that hurdle, the burden of production then shifts to the government to articulate a reason for striking the juror that is nondiscriminatory. *Miller-El I*, 537 U.S. at 328. This reason need not be "persuasive, or even plausible," as long as it's race neutral. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Third, the court must decide whether the government's proffered basis is genuine or pretextual. *See Miller–El v. Dretke*, 545 U.S. 231, 239–40 (2005).

Daniel has not plausibly explained how his attorneys could have cleared even the first step of the *Batson* inquiry. He urges us to infer discrimination from the fact that other jurors were not struck even though they too revealed that they knew practicing lawyers. But that argument glosses over the significant difference between *knowing* a lawyer and *being* one. *See United States v. Alvarez-Ulloa*, 784 F.3d 558, 566 (9th Cir. 2015) (noting "widespread" concern among lawyers and

courts that "jurors with legal experience will bias or commandeer a jury"); *United States v. Bolden*, 545 F.3d 609, 613–14 (8th Cir. 2008) (affirming use of peremptory challenge to strike African-American woman who had "twelve years of legal training"); *United States v. Johnson*, 941 F.2d 1102, 1109 (10th Cir. 1991) (affirming use of peremptory challenge to strike African-American woman who worked as secretary for legal aid). Daniel cannot make out a prima facie case for discrimination by merely pointing out the race of the stricken juror, *see United States v. McMath*, 559 F.3d 657, 664 (7th Cir. 2009), but that essentially is all he has done here.

Because it is clear from the record that Daniel's proposed *Batson* challenge would have failed at step one, that is the end of the inquiry, *see United States v. Johnson*, 756 F.3d 532, 537 (7th Cir. 2014), and the district judge did not need to conduct an evidentiary hearing to determine that counsel was not ineffective in declining to raise a meritless issue.

## B. Loss Calculation

Daniel also argues that his attorneys should have hired an expert to rebut the amount of actual loss attributed to him for purposes of the Guidelines. Daniel asserts that expert testimony would have shown the correct amount to be no more than $400,000, or perhaps even $200,000—well below the approximately $750,0000 amount calculated by Judge Castillo, who imposed a corresponding 14-level upward adjustment, *see* U.S.S.G. § 2B1.1(b)(1)(H) (2012 ed.). An amount from $200,000.01 to $400,000 would have triggered a 12-level adjustment; a loss from $120,000.01 to $200,000 a 10-level adjustment. *See* U.S.S.G. § 2B1.1(b)(1)(F–G) (2012 ed.). For Daniel,

the 12-level adjustment would have meant a Guidelines imprisonment range of 121 to 151 months (or even 97 to 121 months for a 10-level adjustment), as opposed to the 151-to-188 range the judge calculated.

Significantly, Daniel does not argue that the exact figure influenced how Judge Castillo weighed the factors under 18 U.S.C. § 3553(a). He thus concedes—albeit implicitly—that any error in the loss calculation was harmless as long as the correct amount was more than $400,000.00.

The government's position at sentencing was that the refinancing jobs were mostly fraudulent, whereas jobs the Sullivans did for cash involved "honest work," so its loss calculation focused on the revenue they received from refinancing jobs. The government sought to estimate the amount of loss attributable to them by drawing principally on the trial testimony of two witnesses: Rick Kozma, a financial examiner who reviewed records of the Sullivans' business accounts, and Kryzstof Koterba, the Sullivans' primary subcontractor. Kozma testified that during the relevant period (2002 to 2006) the records showed $1.27 million in refinancing proceeds obtained from title companies. During that same period, the records showed payments of $587,000 to Koterba, $62,000 to another subcontractor, and $300,000 to a hardware store named Remodeler's Supply. Koterba, for his part, testified that the most he ever received from the Sullivans for a single job was "maybe up to $8,000."

To account for the possibility that some low-dollar refinancing jobs might have been legitimate, the government excluded from the calculations any refinancing jobs for which the Sullivans received less than $15,000. In setting this $15,000 threshold, the government relied on Koterba's testimony that

the Sullivans never paid him more than $8,000 for a job; the extra $7,000 was an estimate of the portion of the Sullivans' total purchases from Remodeler's Supply that could be expected to go towards materials for an $8,000 job. The government urged the judge to find that the Sullivans caused an actual loss of $1.077 million to 28 homeowners.

The Guidelines instruct district courts to reduce the amount of loss by the "fair market value" of the services a defendant performs before his fraud is discovered, *see* U.S.S.G. § 2B1.1 cmt. n.3(E)(i), so at sentencing the parties debated the amount of credit the Sullivans should receive for any services they'd performed for those homeowners the government identified as victims of the scheme, i.e., those from whom the brothers received at least $15,000 in refinancing proceeds. The government argued that the Sullivans weren't entitled to any credit because they'd falsely held themselves out as licensed contractors, *see id.* § 2B1.1 cmt. n.3(F)(v)(I). The Sullivans countered that they should receive credit for work performed by their subcontractors, who were licensed.

The judge sided with the Sullivans and found that they could deduct the labor and material cost of work performed by subcontractors. So the judge subtracted from the $1.077 million figure both $224,000 for labor costs (28 jobs at $8,000 each) and $105,000 for materials (a pro rata portion of the $300,000 total they spent at Remodeler's Supply plus an extra ten percent to account for materials purchased elsewhere). Because the resulting figure, $748,601.90, was more than $400,000 but not more than $1 million, the judge imposed a 14-level increase under section 2B1.1, as opposed to the 16-level increase the government initially had urged. The judge added that if he'd erred in giving the defendants credit for

work done by subcontractors, then he would find that a loss amount of over a million dollars overstates the seriousness of the Sullivans' crime. He then sentenced both brothers to 168 months' imprisonment, which is near the low end of Daniel's advisory range of 151 to 188 months.

On direct appeal this court affirmed the district judge's loss calculation, in part, because the Sullivans presented "no evidence of their net proceeds from the refinance projects, no invoices from Koterba or other subcontractors, nor any receipts for the materials they purchased from other locations." *Sullivan*, 765 F.3d at 727.

Daniel has not articulated a plausible theory for how the district judge's loss calculation could be nearly twice too high. He initially suggested that he was not associated with one of the companies (New Look Home Services) that John used to engage in fraudulent activity. But that contention conflicts with the testimony at trial, and he seems to have abandoned it on appeal. Daniel also asserted that he should have been allowed to testify about the value of work performed by his staff and to deduct *all* of the expenses associated with running the businesses with his brother. But the judge already ruled that the Sullivans' misrepresentation about their being licensed barred them from receiving an offset for work not done by licensed subcontractors. Daniel does not explain how the fair market value of the work completed *by licensed subcontractors* could be more than the sum calculated by Judge Castillo, and it would be quite perverse for the Sullivans to receive credit for expenses such as the salaries of the telemarketers they hired to cold-call their victims.

With no reason to doubt the district court's calculations, it is unclear what an expert could have done to slash the loss

calculation. Perhaps expert testimony would have led the district judge to calculate a loss amount that was slightly less, but there is no basis in Daniel's submissions or in the record for reducing the amount down to the critical $400,000 threshold. The record reveals the judge's estimation to be conservative, so an evidentiary hearing would not have helped Daniel establish that that counsel's failure to hire an expert amounted to ineffective assistance. *See* U.S.S.G. § 2B1.1 cmt. n.3(C) (clarifying that district court "need only make a reasonable estimate of the loss"); *Spiller v. United States*, 855 F.3d 751, 754 (7th Cir. 2017) (recognizing that no evidentiary hearing is required when allegations in § 2255 petition are conclusory).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment denying Sullivan's § 2255 motion.